## MESAROSH, ALIAS NELSON, ET AL. *v.*
## UNITED STATES.

No. 20. Argued and decided October 10, 1956.—Opinions delivered
November 5, 1956.

*Solicitor General Rankin* argued in support of the Government's motion to remand. *Assistant Attorney General Tompkins* was with him on the motion.

*Frank J. Donner* argued in opposition to the Government's motion and in support of petitioners' motion that the case be remanded to the District Court for a new trial. *Arthur Kinoy, Marshall Perlin* and *Hubert T. Delany* were with him on petitioners' motion and a supporting memorandum.

Mr. Chief Justice Warren delivered the opinion of the Court.

The decision herein passes only on the integrity of a criminal trial in the federal courts. It does not determine the guilt or innocence of the petitioners, and we do not reach other issues propounded in the lengthy briefs or which may be present in the trial record of 5,147 pages. The Solicitor General of the United States moved to remand the case to the trial court for further proceedings because of untruthful testimony given before other tribunals by Joseph D. Mazzei, a Government witness in this case. The counter-motion of petitioners asked for a new trial. The decision is based entirely upon the representations of the Government in its written motion and on the statements of the Solicitor General during the argument on the motions.[1]

The petitioners were charged in a one-count indictment in the District Court for the Western District of Pennsylvania with conspiracy to violate the Smith Act.[2] They

---

[1] The Court directed that oral argument on the motions be heard at the time previously scheduled for the argument on the merits. 352 U. S. 808. Mr. Justice Frankfurter, believing the motion should be granted without argument, filed a dissent.

After hearing argument on the motions, October 10, 1956, the Court recessed to consider the matter, following which its decision to order a new trial was announced from the bench. 352 U. S. 862. Argument on the merits, therefore, was not heard. Mr. Justice Frankfurter, Mr. Justice Burton, and Mr. Justice Harlan dissented from the denial of the Government's motion to remand.

This opinion has been written to amplify the decision announced October 10, 1956. It should be noted that Mr. Justice Minton participated in the consideration and decision of the motions, voting in favor of the order of the Court. On October 15, 1956, prior to the writing of this opinion, he retired from the Court. Therefore he did not participate in the consideration of this opinion.

[2] It was alleged that between 1945 and the date of the indictment the petitioners had conspired to advocate the overthrow of the Gov-

were convicted, and the Court of Appeals for the Third Circuit, sitting *en banc,* affirmed by a divided court. 223 F. 2d 449. This Court granted the petition for writ of certiorari, 350 U. S. 922, and the case was scheduled for argument on October 10, 1956.

On September 27, 1956, the Solicitor General of the United States filed a motion calling the attention of the Court to the testimony given in other proceedings by Mazzei, who was one of the seven witnesses for the Government in this case. In his motion, he stated that the Government, on the information in its possession, now has serious reason to doubt the truthfulness of Mazzei's testimony in those proceedings. While adhering to its position that "the testimony given by Mazzei at the trial [in this case] was entirely truthful and credible," the motion stated that "these incidents, taken cumulatively, lead us to suggest that the issue of his truthfulness at the trial of these petitioners should now be determined by the District Court after a hearing."

The material cited by the Government indicating the untruthfulness of Mazzei on occasions other than this trial can best be presented by setting forth verbatim the description of these incidents presented in the Motion of the Government to Remand:

"On June 18, 1953, Mazzei testified before the Senate Permanent Subcommittee on Investigations, in Washington, D. C., that, at a meeting of the Civil Rights Congress on December 4, 1952, one Louis

ernment of the United States by force and violence and to organize a society or group, the Communist Party, devoted to that purpose. The trial judge ruled that the organization charge was barred by the statute of limitations, but that evidence concerning the 1945 organization of the Communist Party, as well as earlier events, was admissible in determining whether petitioners had conspired to advocate violence.

Bortz told him that he, Bortz, had been 'selected by the Communist Party to do a job in the liquidation of Senator Joseph McCarthy.' Mazzei further testified that the said Bortz conducted Communist Party classes in Pittsburgh to familiarize Party members with the handling of firearms and to instruct them in the construction of bombs.

"On November 14, 1952, Mazzei pleaded guilty to charges of adultery and bastardy in a Pennsylvania state court. This fact was brought out during his cross-examination at the petitioners' trial. On October 2, 1953—after the completion of the trial—Mazzei filed a petition in the state court to have the guilty plea set aside. One of the grounds set forth in his petition was that he 'was not guilty of the charge to which he was induced to plead * * * but did so only in his official capacity (as a Government informant) at the insistence of his superior in the FBI to avoid testifying.' At a hearing on the above petition on October 6, 1953, a Special Agent of the FBI denied Mazzei's allegations under oath. Mazzei's petition was dismissed by the court on October 6, 1953.

"In November 1953, Mazzei, at a secret proceeding, identified a certain Government official as a long-time active Communist Party member.

"On June 10 and 11, 1955, Mazzei testified before the Senate Subcommittee on Internal Security regarding possible Communist influences motivating attempts to discredit Justice Michael Musmanno of the Supreme Court of Pennsylvania. In the course of his testimony, Mazzei identified John J. Mullen, National Director, Political Action Committee, Steel Workers of America, as a member of the Communist Party in Pittsburgh during the period that Mazzei

was a Government informant. Mazzei also testified that since 1942 he met Mullen ten or fifteen times a year, as a fellow Communist Party member.

"On July 2, 1956, Mazzei testified in disbarment proceedings against one Leo Sheiner before the Circuit Court of the Eleventh Judicial Circuit of Florida, in Miami. On cross-examination, Mazzei reiterated his charge that he was induced to plead guilty to the adultery and bastardy charge in the Pennsylvania state court in November 1952 by an Agent of the FBI. Items of his testimony as to alleged Communist activity are as follows:—that he visited Dade County, Florida, on behalf of the Communist Party during each of the years from 1946 to 1952; that the Communist Party in Miami had attempted to lease a bus line which served the Opa-locka Air Base; that in 1948 the Communist Party made plans for the armed invasion of the United States on orders from the Soviet Union and that he, Mazzei, was selected to go to Miami in 1948 because it was a seaport; that he took courses in the Communist Party on sabotage, espionage, and handling arms and ammunition; that he was taught by officers of the Communist Party in Pittsburgh how to blow bridges, poison water in reservoirs, and to eliminate people; that he discussed with Sheiner in 1948 'knocking off' a Judge Holt (a Florida judge) whom they (presumably the Communist Party) were having trouble with, and importing one Louis Bortz, the strong-arm man for the Communist Party, to do the job; that he and the Communist Party had made plans to assassinate Senators, Congressmen, and even went to Washington and beat up a Senator; and that, to his knowledge, Sheiner was extensively engaged in Communist Party activities in 1945, 1947, 1950, 1951, and 1952.

None of this testimony at the Florida proceeding is supported or corroborated by information in the possession of the Government.

"Mazzei likewise testified that the FBI arranged to get him into the Army so that he could watch a certain Communist Party member; that he never wore a uniform and that he was discharged the day after the Communist Party member he was to watch was discharged. In actual fact, Mazzei's career in the Army was the result of the operation of the Selective Training and Service Act of 1940 and the FBI had nothing to do with his service in the armed forces. He also testified that sometimes the FBI paid him about $1,000 a month for expenses. From the period 1942 to 1952, according to the Bureau records, Mazzei was paid the total of $172.05 as expense money.

"Mazzei likewise testified that he had never been arrested in his life. In fact, he was arrested in connection with the paternity case brought against him in Pennsylvania by one Irene Corva. He has been arrested several times subsequent to this for his failure to make support payments to this woman."

On the argument of the motion the Solicitor General, in response to questions by the Court, stated with commendable candor that he believed the testimony given by Mazzei on June 18, 1953, before the Senate Committee concerning "the liquidation of Senator Joseph McCarthy" was untrue. He likewise stated that he believed the testimony given by Mazzei on July 2, 1956, in the Circuit Court of Florida was untrue. And in addition to the Solicitor General's personal opinion, the text of the motion itself shows that the Department of Justice is certain that some of Mazzei's post-trial testimony was contrary to the facts. The Pennsylvania statement of

8

October 2, 1953, concerning his conviction of adultery and bastardy was controverted under oath at that hearing by an agent of the FBI. Mazzei again asserted in the Florida proceeding that he was induced to plead guilty to the adultery charge by an agent of the FBI. In the Florida testimony, he said that the FBI sometimes paid him a thousand dollars a month for expenses, whereas the records of the Bureau showed he was paid a total of $172.05 as expense money. He also testified there that the FBI arranged to put him in the Army to spy on a Party member, whereas the FBI had nothing to do with his Army service; he had been inducted in accordance with the Selective Service Act. All these discrepancies are pointed out in the motion, as quoted above.

As to his bizarre testimony in the Florida proceeding concerning sabotage, espionage, handling of arms and ammunition, and plots to assassinate Senators, Congressmen, and a state judge, the Government's motion suggests that none of it is worthy of belief by stating therein: "None of this testimony at the Florida proceeding is supported or corroborated by information in the possession of the Government."

At the oral argument, however, the Solicitor General stated that although he believed all of this testimony to be untrue, he was not prepared to say the witness Mazzei was guilty of perjury in giving the testimony; that his untrue statements might have been caused by a psychiatric condition, and that such condition might have arisen subsequent to the time of this trial. The Solicitor General, in the light of this position, asked to have the argument on the main case stricken from the calendar and the case remanded to the District Court for a full consideration of the credibility of the testimony of witness Mazzei. Commendable as the action of the Solicitor General was in promptly bringing the matter to our

attention when it came to the attention of his office,[3] we do not believe the disposition of the case suggested by him should be made.

Either this Court or the District Court should accept the statements of the Solicitor General as indicating the unreliability of this Government witness. The question of whether his untruthfulness in these other proceedings constituted perjury or was caused by a psychiatric condition can make no material difference here. Whichever explanation might be found to be correct in this regard, Mazzei's credibility has been wholly discredited by the disclosures of the Solicitor General. No other conclusion is possible. The dignity of the United States Government will not permit the conviction of any person on tainted testimony. This conviction is tainted, and there can be no other just result than to accord petitioners a new trial.

It must be remembered that we are not dealing here with a motion for a new trial initiated by the defense, under Rule 33 of the Federal Rules of Criminal Procedure, presenting untruthful statements by a Government witness subsequent to the trial as newly discovered evidence affecting his credibility at the trial. Such an allegation by the defense ordinarily will not support a motion for a new trial, because new evidence which is "merely cumulative or impeaching" is not, according to the often-repeated statement of the courts, an adequate basis for the grant of a new trial.[4]

---

[3] The Solicitor General's motion stated that his office came into possession of "the history of Mazzei's post-trial testimony" less than ten days before the motion was filed. With one exception, the motion does not indicate when other units of the Department of Justice acquired their information of Mazzei's conduct.

[4] See, e. g., *United States* v. *Johnson,* 142 F. 2d 588, 592, cert. dismissed, 323 U. S. 806; *United States* v. *Rutkin,* 208 F. 2d 647,

Here we have an entirely different situation. The witness Mazzei was a paid informer of the Government—he had been in its employ from 1942 to 1953 for the purpose of infiltrating the Communist Party and reporting the facts found. He testified in this case in that capacity, as a Government witness. It is the Government which now questions the credibility of its own witness because in other proceedings in the same field of activity he gave certain testimony—some parts of it positively established as untrue and other parts of it believed by the Solicitor General to be untrue. The Solicitor General conceded that without Mazzei's testimony in this case the conviction of two of the petitioners cannot stand, but he argued that as to the other three Mazzei's evidence may not have had a substantial effect. But the trial judge believed Mazzei's testimony was material against them for, over objection, he admitted it against all the defendants. There were only seven witnesses. The testimony of Mazzei, at least, gave flesh-and-blood reality to the mass of Communist literature read to the jury to show advocacy of violence by the Communist Party.[5] This being so, it cannot be deter-

---

654; *United States* v. *Frankfeld,* 111 F. Supp. 919, 923, aff'd *sub nom. Meyers* v. *United States,* 207 F. 2d 413. But see *United States* v. *On Lee,* 201 F. 2d 722, 725–726 (dissenting opinion).

See also *United States* v. *Johnson,* 327 U. S. 106, 110–111, n. 4 and n. 5.

[5] Although we have not examined the evidence in this case, in view of the disposition made, we deem it appropriate to consider herein the nature of Mazzei's testimony, since petitioners' countermotion referred us to the appropriate pages of the transcript. The same pages had also been cited in the main briefs of both parties in summarizing the evidence.

Mazzei testified quite specifically about statements by defendants Careathers and Dolsen, made in classes each had taught at a Communist Party school he had attended in 1943 or in private conversations each had had with him at that time.

Careathers taught in his class, Mazzei testified, about the part

mined conclusively by any court that his testimony was insignificant in the general case against the defendants. Thus it has tainted the trial as to all petitioners. As we said last Term in *Communist Party* v. *Subversive Activities Control Board:*

> "When uncontested challenge is made that a finding of subversive design by petitioner was in part the product of three perjurious witnesses, it does not remove the taint for a reviewing court to find that there is ample innocent testimony to support the Board's findings. If these witnesses in fact committed perjury in testifying in other cases on subject matter substantially like that of their testimony in the present proceedings, their testimony in this proceeding is inevitably discredited and the Board's determination must duly take this fact into account." 351 U. S. 115, 124.

There we remanded to the Subversive Activities Control Board for reconsideration of its original determination in

the Negro people would play in bringing about a revolution. [Tr. 1940–1941.] Dolsen told his class, with Careathers present, that the only way a revolution could come about would be by violent overthrow of the government, with the Communist Party helping. [Tr. 1923.] Mazzei related other details of Dolsen's teaching, and passages were read to the jury which he said Dolsen had read to the class from the *History of the Communist Party of the Soviet Union.* [Tr. 1922–1923, 1936–1938.]

Mazzei told how Dolsen and Careathers had each given him private instruction after class, because each was unsatisfied with his understanding of a lesson in Dolsen's class. Mazzei related that each had told him in these separate private sessions that a revolution in this country could only come by armed violence, and that it would be with the help of the Communist Party and the Soviet Union. [Tr. 1940, 1943.] Mazzei also testified that Dolsen had told him, on an auto trip, that if a revolution came about, he would not hesitate to kill, as he had done in China, where he had worked with the Communist Party. [Tr. 1945.]

12

the light of the record shorn of the tainted testimony.
But there the Board, an administrative agency, was the
original finder of fact. Here, on the other hand, in a
criminal case, the original finder of fact was a jury. The
district judge is not the proper agency to determine that
there was sufficient evidence at the trial, other than that
given by Mazzei, to sustain a conviction of any of the
petitioners. Only the jury can determine what it would
do on a different body of evidence, and the jury can no
longer act in this case.[6] For this reason, as well as that
stated in the preceding paragraph, if on a remand the
District Court should rule that the verdict against some
of the petitioners could stand, we would be obliged, on a
subsequent appeal, to reverse and, at that late date,
direct that a new trial be granted.[7] This case was insti-

---

[6] Cf. *Gordon* v. *United States,* 344 U. S. 414, 422–423.

The present situation is different from that in *United States* v. *Flynn,* 130 F. Supp. 412, reargument denied, 131 F. Supp. 742. There the defense moved for a new trial on the basis of an affidavit in which a witness recanted his testimony after the trial. The Government charged that the recantation, rather than the testimony it contradicted, was the lie. Hence there was a factual issue to be determined at the outset, unlike the present case, where there is no conflict between the trial testimony and the subsequent matter brought forward by the Government as bearing on credibility. This difference has been recognized by the courts as calling for the application of different tests in passing on a motion for new trial, even without the added distinction of this case that it is the *Government* which questions the witness's credibility. See, *e. g., United States* v. *Johnson,* 142 F. 2d 588, 591–592, cert. dismissed, 323 U. S. 806; *United States* v. *Hiss,* 107 F. Supp. 128, 136, aff'd, 201 F. 2d 372. Therefore, we express no opinion as to the procedure followed by Judge Dimock in the *Flynn* case.

[7] Cf. *Remmer* v. *United States,* 347 U. S. 227, 348 U. S. 904, 350 U. S. 377.

Because the situation raised by the Solicitor General's motion is quite distinct from that of the ordinary defense motion for new trial, see pp. 9–11, *supra,* we would not consider ourselves bound on a

tuted four and one-half years ago; petitioners have been proceeding *in forma pauperis*. The interests of justice could not be served by a remand that must prove futile.

It might be different if we could see in this case any factual issue upon which the District Court, on a remand, could make an unassailable finding that Mazzei's other falsehoods were differentiated from his testimony herein. But it is not within the realm of reason to expect the district judge to determine, as the Government indicated it would ask him to do, that the witness Mazzei testified truthfully in this case in 1953 as an undercover informer concerning the activities of the Communist conspiracy, yet concurrently appeared in the same role in another tribunal and testified falsely—possibly because of a psychiatric condition—about a plan by different members of the Communist conspiracy to assassinate a United States Senator.[8] That would be an unreasonable determination to make even though the judge might believe that Mazzei's bizarre testimony in 1956 concerning plans for the assassination of other officials, the destruction of bridges, training in sabotage and handling arms, and the poisoning of water in reservoirs, all to destroy the Government of the United States, was the product of a mental or emotional con-

---

review of the District Court's ruling in this situation by the limitations expressed with reference to the defense motion in *United States* v. *Johnson,* 327 U. S. 106.

See also note 6, *supra.*

[8] The trial of petitioners started February 24, 1953. Mazzei testified against petitioners on March 26, 27, and 30. It was on June 18 that he testified before the Senate Committee. On July 9, a motion for a mistrial was made on the basis of the prejudice alleged to be caused petitioners by the publicity given the June 18 testimony of Mazzei concerning the assassination of Senator McCarthy. Mistrial was denied. The jury found petitioners guilty on August 20. They were sentenced on August 25, on which date motions for new trial were denied.

dition that had developed only after the time of this trial.

Mazzei, by his testimony, has poisoned the water in this reservoir, and the reservoir cannot be cleansed without first draining it of all impurity. This is a federal criminal case, and this Court has supervisory jurisdiction over the proceedings of the federal courts.[9] If it has any duty to perform in this regard, it is to see that the waters of justice are not polluted. Pollution having taken place here, the condition should be remedied at the earliest opportunity.

> "The untainted administration of justice is certainly one of the most cherished aspects of our institutions. Its observance is one of our proudest boasts. This Court is charged with supervisory functions in relation to proceedings in the federal courts. See *McNabb* v. *United States,* 318 U. S. 332. Therefore, fastidious regard for the honor of the administration of justice requires the Court to make certain that the doing of justice be made so manifest that only irrational or perverse claims of its disregard can be asserted." *Communist Party* v. *Subversive Activities Control Board,* 351 U. S. 115, 124.

The government of a strong and free nation does not need convictions based upon such testimony. It cannot afford to abide with them. The interests of justice call for a reversal of the judgments below with direction to grant the petitioners a new trial.

*It is so ordered.*

MR. JUSTICE BRENNAN took no part in the consideration or decision of this case.

---

[9] Cf. *McNabb* v. *United States,* 318 U. S. 332, 340–341; *Thiel* v. *Southern Pacific Co.,* 328 U. S. 217, 225.

MR. JUSTICE HARLAN, with whom MR. JUSTICE FRANK-
FURTER and MR. JUSTICE BURTON join, dissenting.

When the Court's order denying the Government's
motion to remand, and granting the petitioners a new trial,
was announced by THE CHIEF JUSTICE on October 10,
MR. JUSTICE FRANKFURTER, MR. JUSTICE BURTON and I
dissented.[1] We reserved our right to file an opinion stating
our reasons for thinking that the Government's motion
should have been granted. This is that opinion.

On August 20, 1953, after a lengthy jury trial, peti-
tioners were convicted of violating the Smith Act and the
general federal conspiracy statute, 54 Stat. 670, 671, 18
U. S. C. §§ 2385, 371, by conspiring to advocate the over-
throw of the United States Government by force and
violence. The Court of Appeals for the Third Circuit,
sitting *en banc,* affirmed by a divided vote.[2] This Court
granted certiorari.[3]

On September 27, 1956, about two weeks before the
case was scheduled for argument, the Solicitor General
filed a motion asking us to remand the case to the Dis-
trict Court for a hearing as to the truthfulness and
credibility of one Mazzei, a government informant and
witness at the trial. The occasion for this motion was
that the Solicitor General's office, some ten days before,
had come into possession of information which led it seri-
ously to doubt the correctness of certain testimony given
by Mazzei in various independent proceedings, all but one
of which occurred after the trial, as to his relations with
Communists and the Federal Bureau of Investigation.[4]

---

[1] 352 U. S. 862.

[2] 223 F. 2d 449.

[3] 350 U. S. 922.

[4] One of these episodes took place before the Senate Permanent
Subcommittee on Investigations, in Washington, D. C., on June 18,
1953 (while the trial was still in progress). There Mazzei had
testified that at a meeting of the Civil Rights Congress on December

.In its motion papers the Government stated that while it still believed that Mazzei's testimony at the trial had been "entirely truthful and credible," his post-trial testimony in these other proceedings was such as to "lead us to suggest that the issue of his truthfulness at the trial of these petitioners should now be determined by the District Court after a hearing." Petitioners' answer to this motion was that, while they considered themselves entitled to a judgment of acquittal or a new trial on the basis of the Government's disclosures, disposition of the Government's motion should nevertheless await this Court's decision on the issues brought here by the writ of certiorari.

On October 8, the Court directed that the Government's motion be heard orally at the threshold of the main case. My brother FRANKFURTER, who felt that the motion should have been granted forthwith, filed a dissenting memorandum.[5] When the matter was heard by the Court on October 10, the positions taken by the Government and the defense were as follows: The Government was not yet prepared to say that Mazzei had committed

---

4, 1952, one Louis Bortz (an alleged Communist Party functionary) told him that he, Bortz, had been "selected by the Communist Party to do a job in the liquidation of Senator Joseph McCarthy." On the oral argument the Solicitor General told us that the Government was not prepared at the time of the trial to regard this testimony of Mazzei as a fabrication, because Bortz when questioned on this subject before the Senate Committee had pleaded his privilege, stating that the answers to the questions "would" incriminate him. It appears that Mazzei's Senate testimony was brought to the attention of the trial judge and that it was the basis of an unsuccessful defense motion for a mistrial. The Solicitor General further stated that it was not until the recent discovery of Mazzei's later testimony in the other post-trial collateral proceedings—particularly that given in certain Florida disbarment proceedings on July 2, 1956—that his department began to have serious doubts as to Mazzei's truthfulness or credibility.

[5] 352 U. S. 808.

perjury either at the trial or in any of the collateral proceedings.[6] Conceivably, the Solicitor General thought, it might turn out that Mazzei was a psychiatric case. The Solicitor General pointed out that the petitioners had

[6] As to Mazzei's trial testimony, the Solicitor General stated: "Before the witness [Mazzei] was presented to the [trial] court, his testimony was carefully appraised as to whether or not it was supported by any other material the Department had, and he was not contradicted. Although witnesses took the stand in behalf of the defendants his testimony was not contradicted at all, and that was one of the factors that bothered the Government in connection with these subsequent events that have caused us to conclude that this man's testimony should be carefully reexamined by the lower court in regard to validity at the time of the trial, because of what has occurred since, which, ordinarily, even though there was actual perjury, would not determine the validity of the testimony at the trial, depending upon what the circumstances were."

As to Mazzei's testimony in the collateral proceedings, the Solicitor General stated: "We believe that his [1953 Senate] testimony in that regard [the McCarthy incident] was not credible in light of what happened later [in the Florida disbarment proceedings]. We do not know at this point whether or not there is something psychiatric about this situation. We are disturbed about that." The Solicitor General further stated that, while his "personal belief is he [Mazzei] was not truthful" in his testimony as to the McCarthy episode, "I don't want it left on the record that I believe this man to be a perjurer, because I think in order to commit perjury you have to have the intent, and that is what disturbs me about this whole situation. I can't accept his testimony, over all these events [referring to Mazzei's Senate and Florida testimony], as being valid. But whether or not he knowingly does it with the intent [to commit perjury] is something else and that is what I can't follow through."

As to the possibility of Mazzei's being a psychopath: The Government's motion papers showed that in 1952 Mazzei had pleaded guilty to charges of adultery and bastardy in a Pennsylvania state court, and that this fact had been brought out at petitioners' trial. They further showed that in 1953, after petitioners' trial had ended, Mazzei had moved in the Pennsylvania court to set aside his former plea, alleging that he "was not guilty of the charge to which he was induced to plead . . . but did so only in his official capacity (as a Government informant) at the insistence of his superior in the FBI

not previously moved for a new trial on the grounds relied upon in the Government's motion, although much of the later information as to Mazzei was known to them at the time of their motion for reargument in the Court of Appeals. Even so, the Solicitor General felt that in the broader interests of justice it was his duty to pursue the matter as soon as it came to his knowledge that a cloud was cast upon Mazzei's truthfulness or credibility.[7] If he had been satisfied that Mazzei was a per-

---

to avoid testifying." These allegations, the Government informs us, were denied under oath by the F. B. I. and Mazzei's application to set aside his plea was denied by the Pennsylvania court. Further, the Government's motion papers here show that in the 1956 Florida disbarment proceedings Mazzei testified that the F. B. I. had arranged to get him into the Army so that he could watch a certain Communist Party member, whereas in fact Mazzei was drafted into the Army, and the F. B. I. had nothing to do with it. The Government states that in the same proceedings Mazzei testified that the F. B. I. paid him about $1,000 a month for expenses, whereas over the entire period from 1942 to 1952 the F. B. I. had paid him total expense money of only $172.05; and that Mazzei testified he had never been arrested, whereas in fact he had been arrested several times. As to these episodes the Solicitor General stated at the oral argument: "It certainly seems to me that that is a very peculiar action, and that he [Mazzei] should have anticipated, even if he wanted to lie about it, that the FBI agent would be there promptly testifying to the facts. And so it is very unusual to me that a person normally, wanting to falsify, would do such a thing. But, I think the trial courts have examined into competency a good many times, and do it every day, and should be able to determine whether or not he was competent at the time." The Solicitor General also stated that he was "disturbed about whether it [a psychopathic condition] occurred even back at the trial [of these petitioners], and I think the court should examine into that carefully." (The above, and similar quotations, are taken from the tape recording of the Solicitor General's oral argument before this Court, the writer's interpolations being indicated by brackets.)

[7] As to this the Solicitor General stated: "If I may say one word more in regard to that [the failure of the defense to move for a new trial], I feel that the obligation of the Government in a situation of

jurer, the Solicitor General stated, he would have recommended that this Court reverse the convictions of two of the petitioners (Careathers and Dolsen). Since he was not so satisfied, he thought the proper procedure was to remand the case to the District Court for full exploration of the truthfulness and credibility of this witness.[8] As to the other three petitioners, the Solicitor General regarded Mazzei's trial testimony of so little importance that the trial court, even if it found Mazzei was a perjurer, would have to review the entire case against them before ordering a new trial. Petitioners' position was that if this Court was unwilling to hear the main case on the merits, it should, without more, deny the Government's motion and reverse the convictions with directions for acquittal or at least a new trial. At the conclusion of the oral argument on the motion to remand, the Court re-

this kind reaches far beyond the rights of these particular defendants, and it is its duty to this Court, and to the country, and it is our obligation in a situation of this kind, to try and see that justice is done. . . . We may be criticized for being too late, but I think it is never too late, to try to do justice. Having come to that conclusion [that the validity of this testimony is open to doubt], I think we should come before the courts, whichever one is proper, and try to get a correction of the wrong, if there is one."

[8] The Solicitor General stated: "Well, we would have recommended that [reversal] to the Court if we had been satisfied ourselves that Mazzei's testimony at the time of trial—which we think was the determining point in the proper conduct of judicial proceedings—[was untruthful], . . . because we feel at least as to these two defendants [petitioners Careathers and Dolsen] there was no [other] basis for their conviction. But it is possible that something has happened to this man [Mazzei], that his uncontradicted testimony was valid at the time of trial, and it seemed to us that with a long case tried like this and the jury involved and the trial court and the courts of appeal, and so on, the proper thing to do was to send it back to the trial court for its examination carefully into this question to determine what the fact is, and then assume that he [the trial court] would do his duty, which I think he will, and have the case handled properly at that point."

cessed to consider the matter, following which its decision denying the Government's motion was announced from the bench.

We are in full agreement that the Court properly refused to pass on the merits of the case until this cloud upon the integrity of the convictions had been dissolved. *Communist Party* v. *Subversive Activities Control Board,* 351 U. S. 115. What we object to is that this Court itself should have undertaken to deal with the subtle and complicated issues presented by the Government's motion instead of sending the case back to the District Court for the determination of these issues after a full investigation. It is fitting that we state our reasons for this view.

1. We believe that the reversal of these convictions represents an unprecedented and dangerous departure from sound principles of judicial administration. The Court has overturned the results of a complex, protracted, and expensive trial before any investigation has been made of the suspicions which the Solicitor General brought to the attention of the Court promptly after the facts giving rise to them came to his notice. We find the Court's justification of its summary action unconvincing.

The basic justification given is that "either this Court or the District Court should accept the statements of the Solicitor General as indicating the unreliability of this Government witness." In effect, the Court has treated the case as if the Solicitor General had conceded the untrustworthiness of Mazzei's testimony at the trial. To us this reflects a misunderstanding of the Solicitor General's position. As to Mazzei's trial testimony, the Solicitor General—whose forthrightness and candor no one could doubt, and whose conduct in this situation has been commended by this Court—represented that the Government did not consider it yet had sufficient basis for regarding such testi-

mony as untruthful. As to Mazzei's testimony in collateral proceedings, the Solicitor General, while stating his personal belief that some of it was untruthful, represented that he could not responsibly say whether such testimony involved perjury rather than psychopathic imbalance, and, if the latter, when that condition first arose or whether it was of such a character as to affect Mazzei's competency as a witness. In short, we think it abundantly clear that the Solicitor General conceded no more than that the situation was one that called for a thorough investigation.

We also observe that the Court finds that "no other conclusion is possible" than that "Mazzei's credibility has been wholly discredited," and that some parts of his post-trial testimony have been "positively established as untrue." We do not see how these conclusions can be reached in the face of the Government's representation that it still believes Mazzei's trial testimony to have been "entirely truthful and credible," and without the production of any evidence, or the examination and cross-examination of Mazzei and those who contradicted him, as to the post-trial episodes which have been called in question. Nor can we agree with the manner in which the Court has dealt with the Solicitor General's contentions as to petitioners Mesarosh, Albertson and Weissman. The Court simply says that Mazzei's testimony against Careathers and Dolsen was of such a character that, having been admitted against all defendants, it tainted the whole trial. But we cannot understand how this can be said short of a painstaking appraisal of the entire record which the Court acknowledges it has not read. The Court was quite right not to read the record, for in our view this was not the business of this Court, but that of the District Court; but by the same token, we think, the decision as to whether a new trial was justified was also, in the first instance, the business of the District Court.

In the *Communist Party* case, *supra,* where there were undenied charges of perjury, we did not undertake to resolve those charges here, but instead sent the case back to the Board for exploration. We think a similar course should have been followed in this case. The Court suggests that the situation presented here differs from that in the *Communist Party* case, in that there the Board was the trier of the facts, whereas here it was for the jury, not the court, to weigh the truthfulness and credibility of Mazzei's trial testimony. This, however, overlooks the fact that as a preliminary to a new trial it must first be determined whether any of Mazzei's collateral testimony, now drawn in question, so reflects upon the truthfulness or credibility of his trial testimony as to warrant submission of the case to a new jury. That preliminary determination has always been recognized as the function of the trial court. *United States* v. *Johnson,* 327 U. S. 106; *United States* v. *Troche,* 213 F. 2d 401; *United States* v. *Rutkin,* 208 F. 2d 647; *Gordon* v. *United States,* 178 F. 2d 896, cert. denied, 339 U. S. 935.[9]

Finally, the Court suggests that a different result might have been required if it were dealing with a defense motion for a new trial. However, we fail to see why the Government's motion, which was prompted by a desire to ascertain the true facts in all their ramifications, and which is aimed at the possibility of a new trial, calls for a different result or procedure than a defense motion for a new trial based on similar suspicions.

2. The District Court was the proper forum for the kind of investigation which should have been conducted here. This Court, and for that matter the Courts of Appeals, are

---

[9] Whatever may be the differences between the rules governing a motion for a new trial based upon recantation of trial testimony or other types of "newly discovered" evidence, *ante,* p. 12, n. 6, certainly none of those differences suggest that the trial court is not the proper tribunal for resolution of the issues presented by such a motion.

ill-equipped for such a task. We need say no more than that appellate courts have no facilities for the examination of witnesses; nor in the nature of things can they have that intimate knowledge of the evidence and "feel" of the trial scene, which are so essential to sound judgment upon matters of such complexity and subtlety as those involved here, and which are possessed by the trial court alone.

3. Certainly there is no room for doubting the Solicitor General's good faith in this matter, or for supposing that the conduct of the further proceedings below would fall short of the highest standards of criminal justice. We have the Solicitor General's assurance that all of the Government's information bearing upon Mazzei's truthfulness and credibility would be made available to the defense, subject to appropriate safeguards.[10] As to the end result,

[10] In response to a question as to whether the defense would be furnished with all of the Government's information bearing on the truth of Mazzei's Senate testimony relating to the McCarthy incident, the Solicitor General stated: "Well, that would depend on what the trial court thought should be done, I think, in the conduct of the case. The only reason I suggest that possibly it should not be made available to them is that in this whole problem there are several people involved who might get hurt by a public airing of their connection with this matter. And it would be too bad, and very unfortunate, if it wasn't handled so as not to injure those people when it isn't necessary to the proper handling of this problem. . . . We will do whatever this Court thinks we should do, but what I had in mind was to lay before the judge all of the information the Government has about the entire matter, and then he can sort out and protect the various innocent persons, who are described in the files, and should not be hurt in such a proceeding, and yet give them [the defendants] the benefit of the full and complete protection in such a proceeding as to what the facts are in this matter. . . . I had in mind that certain portions the judge would handle in camera so as to protect innocent people. And all others, that would reach into the merits of the situation, would certainly be handled by the court in such a way as to give all the parties an adequate opportunity to present their defense."

the Solicitor General stated that in his view the trial court would have to acquit petitioners Careathers and Dolsen if it found that Mazzei had perjured himself at the trial or had then been incompetent to testify, and as to the other petitioners might have to order a new trial.[11] We need not consider at this time whether the Solicitor General's statement exhausts all of the factors that might require a new trial. Suffice it to say that we regard the Solicitor General's approach to this difficult situation as unexceptionable; and it is hardly to be assumed that the District Court would not do its full duty or would fall into error. We need only add that had the Government's

---

[11] The Solicitor General stated: "Yes, without his [Mazzei's] testimony as to those defendants [Careathers and Dolsen], I do not think they could have been convicted. I think the court would have had to direct a verdict in their favor, at least. As to the other three defendants, there is practically no testimony by this witness. It is very slight. I could give it to the Court. . . . [It] seems to me the lower court would have to examine the situation and see . . . whether or not it [Mazzei's testimony] had an effect on the conviction of every one of the defendants. . . . It would seem to me that . . . the trial court could determine the extent of the effect that this witness might have had on the other defendants, because there was a large volume of testimony in regard to the other defendants that bore directly upon their participation in the conspiracy, and their overt acts; and the testimony of this witness was so limited as to even a reference—he said that they solicited money from him, two of them—and is so slight as to any direct connection with it, that it seems to me the court would have to weigh whether or not, under that situation, he would decide that there is a doubt in his mind, in which case I am sure he would [direct a new trial]." In the absence of an exhaustive examination of the voluminous record, we are unable to understand how any adequate evaluation could be made of these considerations as to the petitioners Mesarosh, Albertson, and Weissman. When he was asked to "assume" that the trial court would find Mazzei to have been a perjurer, and his trial testimony to have been of importance in the conviction of these three petitioners, the Solicitor General promptly stated that he was "satisfied" that the court would set aside their convictions "if he came to these conclusions."

motion been granted this Court would no doubt have accompanied its remand with appropriate instructions to guide the District Court in coping with this complicated problem. And surely the fact that this case has been long-drawn-out does not justify short-circuiting normal and orderly judicial procedures. The procedure adopted in *United States* v. *Flynn,* 130 F. Supp. 412, 131 F. Supp. 742, commends itself to us as a proper means of dealing with problems such as those raised by the Solicitor General's motion. We do not, of course, even remotely imply that we give any tolerance to the notion that a criminal conviction found to be infected by tainted testimony should be allowed to stand. We do say that ascertainment of where the truth lies here requires the kind of probing that is beyond the facilities and practices of this Court.

For the foregoing reasons we dissent. We think that the Government's motion to remand should have been granted.

Mr. Justice Frankfurter.

Less than six months ago, in *Communist Party* v. *Control Board,* 351 U. S. 115, a case that raised important constitutional issues, this Court refused to pass on those

issues when newly discovered evidence was alleged to demonstrate that the record out of which those issues arose was tainted. It did so in the following language:

"When uncontested challenge is made that a finding of subversive design by petitioner was in part the product of three perjurious witnesses, it does not remove the taint for a reviewing court to find that there is ample innocent testimony to support the Board's findings. If these witnesses in fact committed perjury in testifying in other cases on subject matter substantially like that of their testimony in the present proceedings, their testimony in this proceeding is inevitably discredited and the Board's determination must duly take this fact into account. We cannot pass upon a record containing such challenged testimony. . . ." 351 U. S., at 124–125.

The Court in that case, over the protest of the Government, remanded the proceedings to the Subversive Activities Control Board so that it might consider the allegations against the witnesses and, if necessary, reassess the evidence purged of taint.

In this case, the Government itself has presented a motion to remand the case, alleging that one of its witnesses, Joseph Mazzei, since he testified in this case, "has given certain sworn testimony (before other tribunals) which the Government, on the basis of the information in its possession, now has serious reason to doubt." Some of the occurrences on which the motion is based go back to 1953. (It should be noted that the petition for certiorari was filed in this Court on October 6, 1955.) Thus the action by the Government at this time may appear belated. This is irrelevant to the disposition of this motion. The fact is that the history of Mazzei's post-trial testimony did not come to the Solicitor Gen-

eral's notice until less than ten days before the presentation of this motion.* It would, I believe, have been a disregard of the responsibility of the law officer of the Government especially charged with representing the Government before this Court not to bring these disturbing facts to the Court's attention once they came to his attention. And so, it would be unbecoming to speak of the candor of the Solicitor General in submitting these facts to the Court by way of a formal motion for remand. It ought to be assumed that a Solicitor General would do this as a matter of course.

The Government in its motion sets forth the facts which lead it to urge remand. The Government lists five incidents of testimony by Mazzei between 1953 and 1956 about the activities of alleged Communists and about his own activities in behalf of the Federal Bureau of Investigation which it now "has serious reason to doubt." The Government also notes that in the trial of this case Mazzei "gave testimony which directly involved two of the petitioners, Careathers and Dolsen." Although the Government maintains "that the testimony given by Mazzei at the trial was entirely truthful and credible," it deems the incidents it sets forth so significant that it asks that the issue of Mazzei's truthfulness be determined by the District Court after a hearing such as was held in a similar situation in *United States* v. *Flynn,* 130 F. Supp. 412.

How to dispose of the Government's motion raises a question of appropriate judicial procedure. The Court has concluded not to pass on the Solicitor General's mo-

---

*The motion for remand states: "The complete details of Mazzei's testimony in Florida, as set forth in this motion, did not come to the attention of the Department of Justice until September 1956, and the history of Mazzei's post-trial testimony did not come to the Solicitor General's attention until less than ten days ago."

tion at this time. It retains the motion to be heard at the outset of the argument of the case as heretofore set down. I deem it a more appropriate procedure that the motion be granted forthwith, with directions to the District Court to hear the issues raised by this motion. I feel it incumbent to state the reasons for this conviction. Argument can hardly disclose further information on which to base a decision on the motion. Furthermore, there may be controversy over the facts, and the judicial methods for sifting controverted facts are not available here. The basic principle of the *Communist Party* case that allegations of tainted testimony must be resolved before this Court will pass on a case is decisive. Indeed, the situation here is an even stronger one for application of that principle, for we have before us a statement by the Government that it "now has serious reason to doubt" testimony given in other proceedings by Mazzei, one of its specialists on Communist activities, and a further statement by the Government that Mazzei's testimony in this case "directly involved two of the petitioners."

This Court should not even hypothetically assume the trustworthiness of the evidence in order to pass on other issues. There is more at stake here even than affording guidance for the District Court in this particular case. This Court should not pass on a record containing unresolved allegations of tainted testimony. The integrity of the judicial process is at stake. The stark issue of rudimentary morality in criminal prosecutions should not be lost in the melange of more than a dozen other issues presented by petitioners. And the importance of thus vindicating the scrupulous administration of justice as a continuing process far outweighs the disadvantage of possible delay in the ultimate disposition of this case. The case should be remanded now for a hearing before the trial judge.