FILED
United States Court of Appeals
Tenth Circuit

March 26, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENH CIRCUIT**

---

UNITED STATES OF AMERICA,

   Plaintiff - Appellee,

v.

GERARDO DE LA CAMPA
RANGEL,

   Defendant - Appellant.

No. 06-2161

(D. New Mexico)

(D.C. No. CR-05-1154-JP)

---

**ORDER**

---

Before **HARTZ**, Circuit Judge, **McWILLIAMS**, Senior Circuit Judge, and **HOLMES**, Circuit Judge.

---

Gerardo De La Campa Rangel was convicted by a jury in the United States District Court for the District of New Mexico on a charge of possession with intent to distribute more than 5 kilograms of cocaine, *see* 21 U.S.C. §§ 841(a)(1), (b)(1)(A). After filing a timely notice of appeal, he presented three challenges to his conviction in his opening brief in this court. We then granted him leave to file a supplemental brief seeking a remand to the district court for a hearing regarding whether the government knowingly relied on perjured testimony by the case agent, who was the chief law-enforcement witness at trial. The argument in the supplemental brief, which had not been raised in district court, was based on

testimony and documents available to Mr. Rangel at trial. Troubled by the matters presented by Mr. Rangel, we abate this appeal to permit Mr. Rangel to proceed with a motion under 28 U.S.C. § 2255 in district court.

## I.    BACKGROUND

The government alleged that on May 1, 2005, Mr. Rangel possessed 12.6 kilograms of cocaine on a bus operated by Guadalajara Tours. The bus was en route from El Paso, Texas, to Denver, Colorado, when it stopped in Albuquerque at about 11:00 P.M. and was boarded by Drug Enforcement Administration (DEA) Agent Jarrell Perry and DEA Task Force Officer Greg Rees. The officers discovered the cocaine in a black bag underneath the seat next to where Mr. Rangel had been sitting. After a brief investigation they arrested him.

The issue of perjury arises because of contradictions between various sworn statements by Agent Perry, and between those statements and testimony by the bus driver and a passenger, relating to who, if anyone, saw Mr. Rangel remove the bag containing the cocaine from a larger bag that he carried onto the bus in El Paso. (The smaller bag and its contents were not dusted for fingerprints.) We summarize the relevant statements and testimony.

### A.    Perry's Affidavit in Support of the Complaint

On May 2, 2005, the government filed a criminal complaint against Mr. Rangel. In an affidavit attached to the complaint, Perry stated that "[a] witness on the bus observed DE LA CAMPA RANGEL remove the small black

-2-

bag [which contained the cocaine] from the red/black duffle bag, then place the small black bag underneath of the seat beside DE LA CAMPA RANGEL's seat." R. Vol. I, Doc. 1, Attach. at 1.

## B. Perry's Testimony at the Preliminary Hearing

Perry gave the same account at the preliminary hearing on May 3, 2005. When asked on direct examination whether he had "receive[d] information at some point from a witness or witnesses that tied Mr. Rangel to the bag," R. Vol. III at 7, he responded, "Yes, there was a witness who was on the bus, who informed me that they observed Mr. Rangel remove that small black bag that was inside of the red and black duffel bag that he claimed to be his, he removed it from that bag and placed it underneath the seat that was directly beside him." *Id.* at 7–8.

Defense counsel cross-examined Perry regarding the alleged witness:

Q: Did the alleged eyewitness approach you or the other officer with information about what he saw?
A: Yes.
Q: Did you personally observe the demeanor of that witness?
A: I spoke with the witness, yes.
Q: Did that witness appear to be nervous in any way?
A: No.
Q: Sweating?
A: No.
Q: Did you have any reason to rely on the credibility of that witness from any other information you had about that witness?
A: They seemed to be credible to me, yes.
Q: Simply from your observations on the bus?
A: I don't—I don't understand your question?

Q: Did you know that witness before?
A: Yes.
. . .
Q: Did that eyewitness provide you with accurate information in the past?
A: Yes.
Q: Was it about drugs specifically?
A: Yes.
Q: Has that witness testified before?
A: I'm not aware if they have or not. Not in any cases I've been involved in.
Q: How many contacts have you had with that witness?
A: What do you mean by contact?
Q: Obtaining information—I'm talking about reason to rely on that witness. In other words, how much you contacted that witness?
A: I've had—when you say contact, I've had like verbal contact probably hundreds of times.
Q: Is it—is it fair to say that that witness was involved in drugs?
A: To my knowledge, no.
Q: Was he working off any charges?
A: With me, no.
. . .
Q: Did you or the other agent ask any of the other passengers if they saw Mr. De La Campa take that small black bag out of his bag?
A: Yes, we did.
Q: Did anyone else see that?
A: The one witness that I stated earlier, no one else observed that.
Q: Besides that witness, no one saw that?
A: Correct.
Q: Did you specifically ask people about that bag, as it related to Mr. De La Campa?
A: I asked everyone on the bus if it belonged to them or if they knew who it belonged to.
Q: Did you ask them if they saw Mr. De La Campa touch that black bag?
A: I didn't ask that question, no.

*Id.* at 12–14.  In short, Perry testified at the preliminary hearing that he had talked with a person who had observed Mr. Rangel's reported actions on the bus, a person with whom he had had verbal contact "hundreds of times."  *Id.* at 13.

## C.    Perry's "DEA-6" Report

Perry provided a detailed account of his investigation in a DEA-6 report. Although it appears that he prepared the report on the same day as the preliminary hearing, the report contradicts his testimony regarding the tip he had received.  It states that he had received the tip, not from an eyewitness on the bus, but from a source who relayed the information from the bus driver about four hours before the bus arrived in Albuquerque.  According to the report, the bus driver had seen, through his rearview mirror, Mr. Rangel remove the small bag from the bag he had carried onto the bus.  The report states:

1.    On May 1, 2005, at approximately 7:10 p.m., S/A Perry received a telephone call from a Source of Information, hereafter referred to as SOI, who informed S/A Perry of the following information.  The SOI said that the bus driver for the Guadalajara Tours Bus informed the SOI that there was a suspicious passenger on the bus traveling to Denver, Colorado. The bus driver informed the SOI that he was seated in the driver's seat when a passenger, identity unknown at this time, walked onto the bus carrying a large sized red/black duffle bag, to his respective seat and sat the bag down in the floor area beneath his feet.

2.    The bus driver approached the passenger and observed that the passengers red/black bag was partially lying in the aisle way. The bus driver attempted to move that bag with his foot and observed that it was very hard to move because of the weight of the bag.  The bus driver informed the passenger that his red/black bag was too large to have on the top passenger

compartment of the bus and that it needed to be placed underneath of the bus with the luggage. The bus driver picked up the red/black bag and observed that it was very heavy. The passenger immediately removed his red/black bag from the hands of the bus driver and informed the bus driver that he did not want his bag placed underneath of the bus. The passenger placed the red/black bag in the empty window seat beside him and placed a blanket/clothing on top of the bag, thus covering it up. The bus driver informed the passenger that the red/black bag was very heavy and asked the passenger what was inside of the bag. The passenger informed the bus driver that his bag contained blankets and tools.

3.      The bus driver returned to his driver's seat and positioned the rearview mirror in a position to watch the passenger. The bus driver observed the passenger remove a small black colored bag from the red/black bag and place the black bag underneath of the seat beside him. The bus driver observed the passenger place his red/black bag in the overhead luggage compartment directly above the passenger's seat.

Aplt. Br., Ex. 2 at 3–4.

### D.      Trial Testimony by Witnesses On the Bus

Two witnesses at trial had been on the bus with Mr. Rangel. One was the driver, Antonio Padilla; the other was a passenger, Armando Palacios. According to their testimony, it was Palacios, not the driver, who saw Mr. Rangel remove the small bag from the larger bag, and that observation was made shortly before the bus's arrival in Albuquerque, which was hours after Perry had allegedly received the tip from his "source of information." Both Padilla and Palacios had testified at an earlier trial of Mr. Rangel, but the district court had declared a mistrial because the government had not disclosed Mr. Palacios's observations to defense counsel. The testimony of the two witnesses at the first trial was essentially the

-6-

same as at the second trial. If their testimony was true, then either the source of information (who, it turns out, was the bus-station manager in El Paso) concocted a story about what had been observed in El Paso (although parts of the story—in particular, Mr. Rangel's removal of the small bag from the larger bag—uncannily conformed to events several hours later), or Perry concocted a story about what the station manager had told him. We begin with the bus driver's testimony.

### 1.    Mr. Padilla's Testimony

As we describe in detail below, Mr. Padilla testified that he spoke briefly with Mr. Rangel outside the bus, but their interaction was limited to the usual ticketing and baggage-storing activities that occur before boarding, and he had not seen Mr. Rangel remove the smaller bag from the one he carried onto the bus. Thus, his account contradicts Perry's DEA-6 report in several material respects.

On direct examination Mr. Padilla said that as the passengers were boarding the bus he was standing next to the bus door and noticed Mr. Rangel's large bag. After checking the bag with his fingers and leg, he determined that it was "quite heavy," R. Vol. V at 99, and told Mr. Rangel that he needed to store the bag with the luggage underneath the bus. Mr. Rangel disregarded Mr. Padilla's instructions and got back in line to board the bus. After telling Mr. Padilla that once his pillow and blanket were removed from the bag it would fit in the rack inside the bus, Mr. Rangel was permitted to board with the bag. Before leaving El Paso, however, Mr. Padilla asked the station manager to call Perry. He

explained: "When you see a person carrying a large bag, or that I see the person is suspicious or the person is nervous, I call [Perry] to come check the bus." *Id.* at 105.

On cross-examination Mr. Padilla said that the information he had conveyed to the station manager was sparse. He had not told the manager any of the information contained in the DEA-6 regarding Mr. Rangel's actions upon boarding the bus or Mr. Rangel's removal of the small bag from the one he carried onto the bus. Indeed, Mr. Padilla had never observed most of what was reported in the DEA-6 report. He testified: "What I told the DEA, and I did not tell it to the DEA, I told it to the company's manager, that there was a suspicious person with a bag and that the person was nervous, but I never said that he was going down the aisle walking with that bag, because I didn't see him. I only saw him getting on." *Id.* at 141.

Defense counsel's cross-examination sought to emphasize the discrepancies between the DEA-6 report and Mr. Padilla's testimony. Asked whether the report correctly stated that he walked up to Mr. Rangel, told him that he needed to remove the bag from the aisle, and kicked Mr. Rangel's bag with his foot, he responded, "It's false." *Id.* at 141. As for the DEA-6's statement that the driver, through his rearview mirror, had observed Mr. Rangel remove the smaller bag from the bag he carried onto the bus, defense counsel elicited that Mr. Padilla did

not see, and could not have seen, Mr. Rangel take the small bag out of his larger

bag:

> Q:      So when you're in this position [in the driver's seat], you cannot see what the people in the back of the bus are doing, can you?
> A:      I do see all the passengers when they are seated, but I do not see what they do with their hands.  I do see when they get up to go to the bathroom, which is very different.
> Q:      And the reason you can't see what they are doing with their hands is because the seats are too high in order for you to see down to what they are doing.  Is that correct?
> A:      I see all the passengers' faces, but not their hands.
> Q:      And you never told anyone that my client had removed a black bag from the red/black bag and placed it underneath the seat in front of him?
> A:      No, never.
> Q:      Or beside him?
> A:      Just the bag that he had beside him.  That's all.
> Q:      Or underneath his seat?
> A:      No, I never saw anything like that.

*Id*. at 147–48.

> This point was underscored on recross-examination:

> Q:      You're not saying that you saw my client with this bag marked 1D [the small bag], are you?
> A:      No.
> Q:      And you never saw my client take it out of another bag and put it underneath his seat?
> A:      No.
> Q:      Nor in the seat beside it?
> A:      Only the red one.
> Q:      Nor the black bag underneath the seat in front of it?
> A:      Just the red one beside him.  That's all I saw.

*Id*. at 155.  And the recross-examination also pinned down what Mr. Padilla had

told (and not told) the station manager:

Q:    [Y]ou were seated in the driver's seat when a passenger, the identity you didn't know of at the time, walked onto the bus carrying a large-sized red and black duffle bag to his respective seat and sat the bag down on the floor area beneath his feet.  Did you ever say that to the [station manager]?

A:    No.

Q:    Do you remember all of the other statements that I read into the record that are in the report?  Do you remember them?

A:    Repeat them, and I'll listen to them again.

Q:    Okay.  That you, the bus driver, approached my client on the bus and observed that his red-and-black bag was partially laying in the aisleway, and that you attempted to move the bag with your foot.  Did you say that to the manager?

A:    I told him on the door.

Q:    That's not the question.  Did you make this statement to [the station manager]?  Yes or no.

A:    No, not me.

Q:    Did you tell [the station manager] that you had informed my client that his red-and-black bag was too large to be on the top passenger compartment of the bus and that it needed to be placed underneath the bus in its luggage compartment?  Did you say that you had told that to my client?  Did you say to the manager that you said this?

A:    I told the manager about the bag when I was inside, not when I was outside.

Q:    You told the manager that you had lifted the bag when you were outside the bus?  You told the manager that?

A:    Yes.

Q:    Okay.  Did you tell the manager that my client had told you that the bag had blankets and tools in it?

A:    No, he told me blankets and pillows, not tools.

Q:    Okay.  Did you tell the manager that you had returned to your seat, had positioned the rearview mirrors in a position to watch my client, that you saw my client remove a small, black-colored bag from the red/black bag and place the bag underneath of his seat?  Did you tell that to [the station manager]?

A:    I never said anything like that.

*Id*. at 155–57.

### 2. Mr. Palacios's Testimony

Mr. Palacios testified that shortly before the bus arrived in Albuquerque he saw Mr. Rangel remove the small bag from the larger bag that Mr. Rangel had carried onto the bus, but he never saw Mr. Rangel place the smaller bag under the seat. Most importantly for present purposes, he testified that he had never told anyone of his observations until months after Perry had prepared the affidavit for the complaint, written the DEA-6 report, and testified at the preliminary hearing. Mr. Palacios's contribution at the time of the arrest was solely to serve as a translator between Perry and Mr. Rangel. When asked whether he had told the officers on May 1 that he had seen Mr. Rangel with the bag on the bus, he responded,

> No. I found out when he told me what was in the bag, I couldn't—I felt that my life could be threatened, to me, because I felt uncomfortable with the people around the bus. You never know who he could be traveling with, and those people are very dangerous people. Where I live in El Paso, Texas, the news and everything, you can see from Ciudad Juarez, they kill people.

*Id*. at 233–34.

Mr. Palacios had, however, given Perry his address and telephone number. Then in August 2005, months after the preliminary hearing, Perry, Officer Rees, and the prosecutor traveled to El Paso to speak with him. At the interview he told the government, apparently for the first time, that he had observed Mr. Rangel

remove what "seemed to be a laptop out of the red bag, and just [sit] down" shortly before the bus pulled into the Albuquerque stop. *Id*. at 260.

### E. Trial Testimony by Perry

At the second trial Perry, who had not testified at the first trial before the mistrial was declared, stuck to his DEA-6 report (which, as previously noted, contradicted his preliminary-hearing testimony). He testified that the tip did not come from an eyewitness on the bus, but rather from the El Paso station manager, who had relayed information from the bus driver as the bus was leaving El Paso. During cross-examination he acknowledged that he got no information from the driver, explaining, "I can't conduct an interview with the bus driver . . . . He can speak a little bit of English, and I can speak a little bit of Spanish, so that's the reason that I didn't speak with him on that night or any other occasion about it." R. Vol. VI at 367. He insisted that his DEA-6 contained no errors on his part. He testified, "I did not believe at the time that the report was written that it was false. That's the information that was given to me. That's why it was in that report." *Id*. at 370. He was more emphatic on redirect:

> Q: [I]s the information that's in your [DEA-6 report] accurate as it was relayed to you by another person, a third party, the source of information?
> A: Yes, that is exactly what he told me on May 1st when he made contact with me.

*Id*. at 414–15.

On appeal the government has contended in its brief and at oral argument that Perry's trial testimony did not contradict his preliminary-hearing testimony but that he merely provided more complete information at trial.

## II. DISCUSSION

"If there is any reasonable likelihood that the government knowingly relied on perjury to obtain a guilty verdict, reversal is required." *United States v. Crockett*, 435 F.3d 1305, 1317 (10th Cir. 2006). *See Napue v. Illinois*, 360 U.S. 264, 269 (1959). The government acknowledges on appeal that for this purpose "the case agent is the alter ego of the government and of the prosecutor." Aplee. Supp. Resp. Br. at 19. *See United States v. Antone*, 603 F.2d 566, 569–70 (5th Cir. 1979) (in this context prosecution team includes prosecutors and investigators); *cf. Mesarosh v. United States*, 352 U.S. 1, 9 (1956) (reversing conviction because credibility of paid-informer's trial testimony was "wholly discredited by the disclosures of the Solicitor General" while case was before Supreme Court).

Mr. Rangel seeks a hearing in district court to establish that the government's knowing use of perjured testimony deprived him of a fair trial. He has not contended that he is entitled to proceed under Federal Rule of Criminal Procedure 33, which permits motions for new trial filed within seven days of the verdict or within three years of the verdict if based on newly discovered evidence. He seems to rely on inherent judicial power. At oral argument the government

-13-

suggested that Mr. Rangel's remedy would be to seek relief under 28 U.S.C. § 2255 after resolution of this appeal. It appears, however, that this may be that highly unusual case in which a motion under 28 U.S.C. § 2255 is appropriate while an appeal from the conviction is pending.

This court has recognized that "there is no jurisdictional barrier to a district court entertaining a § 2255 motion while a direct appeal is pending." *United States v. Prows*, 448 F.3d 1223, 1228 (10th Cir. 2006). But "it should only do so in extraordinary circumstances given the potential for conflict with the direct appeal." *Id*. Justification for proceeding with the § 2255 motion is most likely when the § 2255 issues are completely distinct from the issues on appeal. *See id*. at 1228–29. Proceeding with the § 2255 motion is also proper, however, when the motion raises a substantial question about the integrity of the government's prosecution. That integrity is a concern of the highest order, and questions regarding it can take precedence over matters pending on appeal. In *Mesarosh*, 352 U.S. 1, the Supreme Court decided to address the newly raised issue of witness perjury rather than proceeding to decide the issues on which it had granted certiorari. In *United States v. Shotwell Mfg. Co.*, 355 U.S. 233, 241 (1957), the Court followed its practice of "refus[ing] to consider the questions presented for review in the face of a challenge to the integrity of the record based on newly discovered evidence." And in *United States v. Taylor*, 648 F.2d 565, 572 (9th Cir. 1981), the court found extraordinary circumstances requiring the

district court to proceed with an evidentiary hearing on a coram nobis petition while an appeal was pending, stating:

> When, as in the exceptional facts of this case, the collateral claim casts such a dark shadow on a pivotal aspect of the direct appeal and, at the same time, implicates the fundamental fairness of the trial and propriety of the Government's actions, it is our view that the concerns for justice are best served by prompt inquiry either confirming or dispelling the suspicion of irregularity raised. This is particularly true when, as here, the Government has refused forthrightly to account for or support its critical representations of fact.

Because the parties' briefs had not addressed the propriety of abating the appeal and permitting Mr. Rangel to pursue a § 2255 motion, we entered an order on January 23, 2008, asking them to show cause why we should not proceed in that manner. We have received their responses. The government does not object to abatement of the appeal to permit consideration of a § 2255 motion. Mr. Rangel, represented by John T. Carlson, assistant federal public defender for the District of Colorado, also does not object. But Mr. Rangel requests us to take action to resolve two concerns. First, he states that he will need appointed counsel and investigative services to pursue a § 2255 motion, and requests that we direct the district court to arrange for that assistance. Second, he recognizes the severe restrictions on second-or-successive § 2255 motions, *see* 28 U.S.C. § 2255 para. 8, but does not wish to dilute the perjury claim by raising other issues. He therefore requests that we "(1) expressly limit the scope of the proceedings at this stage to the issue in question; and (2) clarify that this limitation will not preclude

-15-

Mr. de la Campa Rangel from timely amending his motion to state other claims, if necessary, after the conclusion of direct review." Aplt.'s Resp. to Order to Show Cause at 3.

We recognize Mr. Rangel's concerns but do not think that action by us is appropriate at this time. We do not order the district court to appoint counsel and fund investigative assistance. Authority for such action rests in the first instance with the district court. *See* 18 U.S.C. § 3006A(a)(2)(B); 28 U.S.C. § 2255 para. 7; Rule 8(c), Rules Governing Section 2255 Proceedings for the United States District Courts. We are confident that if Mr. Rangel moves in district court for assistance of counsel in pursuing a § 2255 motion, the court will respond appropriately. We authorize Mr. Carlson to assist Mr. Rangel in preparing a motion for assistance of counsel.

As to Mr. Rangel's request for an order authorizing amendments to his § 2255 motion after conclusion of direct review, we doubt that we can override any statutory restrictions on such amendments. *Cf. Bowles v. Russell*, 127 S. Ct. 2360 (2007) (habeas petitioner could not rely on district-court order improperly extending time for appeal). We note, however, that to the extent that Mr. Rangel is concerned that other issues will interfere with proper consideration of claims related to the alleged perjury, the district court can stay litigation of unrelated claims until disposition of the direct appeal. *See Prows*, 448 F.3d at 1229.

Therefore, we see no reason to limit the claims that can be raised in the § 2255 motion.

## III.    CONCLUSION

For the reasons stated above, we abate the appeal while Mr. Rangel pursues relief under 28 U.S.C. § 2255 in district court.  We order the parties to file status reports with this court every 60 days from the date of filing this order.

ENTERED FOR THE COURT


Harris L Hartz
Circuit Judge