**UNITED STATES of America,**

v.

**Excel WARREN.**

**No. LR–CR–95–248.**

United States District Court,
E.D. Arkansas,
Western Division.

July 15, 1997.

Paula Casey, U.S. Atty. by Jana K. Harris, Asst. U.S. Atty., E.D. Arkansas, Little Rock, AR, for Plaintiff.

William C. McArthur, McArthur & Finkelstein, Little Rock, AR, for Defendant.

MEMORANDUM OPINION AND ORDER

GEORGE HOWARD, Jr., District Judge.

The central question in this post trial proceeding is whether the post trial testimony of Delbra Heron of February 28, 1997, that Richard Talley told her after the trial that he was the one who stashed drugs in her garage and that he, Richard Talley, was with defendant in the garage and that after they left, the drugs had disappeared, constitutes newly discovered evidence and is sufficient to support defendant's request for relief—a new trial.

Delbra Heron had previously testified, during the course of the trial, on October 17, 1996, as a rebuttal witness for the Government that defendant had entered the garage and after he left, the drugs were gone. No mention or reference was made of Richard Talley.

The following constitutes the testimony given by Delbra Heron during the October 17, 1996, trial in response to questions asked by the Government's attorney:

Q. Was there ever an occasion ... where you found, I believe this is through your son, located some cocaine?

A. Yes, in my garage in some books.

Q. Who actually found that?

A. My son.

Q. What happened, or can you describe for us where it was?

A. It was in my garage ...

Q. Was it white powder?

A. Yes, in some little plastic bags.

Q. What happened to that cocaine?

A. I believe Excel (defendant) took it. Defense counsel objects.

Q. Do you know for sure what happened ...

A. All I know is it left. I can't say that I saw him take it, just actually say it, because all I know is it left there.

Q. Where did you leave it?

A. In the book.

. . . . .

Q. Where did you put the book?

A. Back on the shelf in the garage.

Q. Did Excel Warren later come by?

A. Yes he did.

Q. Did he go into your garage?

A. Yes.

After carefully considering the totality of the circumstances surrounding the charges involved in this proceeding, this Court is persuaded that the evidence given by Delbra Heron on February 28, 1997, is newly discovered evidence because the evidence was discovered after trial; and notwithstanding Delbra Heron's role as a rebuttal witness called to impeach defendant's denial of any association with drugs, Delbra Heron's trial testimony was extremely prejudicial because she was the only credible witness to state, in effect, that defendant had possessed drugs. When she testified, Delbra Heron had not been charged with any criminal conduct, or promised anything by the Government. This fact linked with the jury's exclusive responsibility of determining the credibility of witnesses in a proceeding where credibility is crucial and pivotal, persuades this Court that a new trial is warranted as discussed more fully herein.[1]

## FACTUAL BACKGROUND

Excel Warren was charged in a two count indictment with (1) conspiring with others to distribute and possess with the intent to distribute cocaine and (2) knowingly and intentionally attempting to possess with the intent to distribute approximately 1/4 kilogram of cocaine.

In support of its case, the Government called the following witnesses.

Ronald Watson:

On October 15, 1992, Watson entered into a plea agreement with the Government whereby Watson would cooperate and offer whatever assistance that was requested in an ongoing drug investigation. Watson also

---

1. Excel Warren's initial trial, which commenced on August 7, 1996, resulted in a mistrial on August 9, 1996, because the jury could not reach a unanimous verdict.

agreed, in effect, to refrain from the use, sale, or distribution of drugs in the future. In exchange, the Government agreed to take steps to institute only a two count indictment against Watson charging him with a conspiracy to distribute cocaine and with money laundering; and that upon a plea of guilty to the charges, the Government would, during sentencing, advise the Court of Watson's cooperation and assistance. However, in June or July of 1993, the Government discovered that Watson had made several distributions of cocaine in violation of the plea agreement resulting in negotiations for a second plea agreement which was made on December 3, 1993, providing that in exchange for Watson's assistance, the Government would recommend to the sentencing Court a maximum term of five years incarceration in lieu of the applicable term of ten years.

Ronald Watson testified that he had sold Excel Warren cocaine on at least three occasions between early 1990 and early 1992; that during the initial transaction, he delivered four ounces of cocaine to Warren on a "consignment or front" basis worth between $1,000.00 and $1,500.00, but Warren returned two ounces and paid for two ounces; that in 1991, he sold Warren a kilogram of cocaine for $24,000.00 in cash; and that in early 1992, he sold Warren another kilogram of cocaine for $24,000.00 in cash. Watson stated that he acquired his cocaine from Keith Williams who imported drugs to Arkansas from California.

Ronald Watson, at the direction of Sergeant Don Sanders, an Arkansas State Police Investigator assigned to the Drug Enforcement Administration in Little Rock, Arkansas, invited Warren to his home, in April, 1993, where a video camera had been installed, and asked Warren to sell him a quarter of a kilo of cocaine. Sergeant Sanders sup-plied Watson with $6,500.00 cash to pay for the cocaine with instructions to deliver the money only upon actual delivery of the cocaine. The incident was recorded by the video camera. Warren appeared, but did not have any drugs.[2] However, Warren tried, but without success, to persuade Ronald Watson to deliver the $6,500.00 to him in exchange for his promise to return within a reasonable period of time with the drugs.

Kenneth Piggee:

Kenneth Piggee, who is married to Tina Piggee—Warren's former secretary—testified that he had seen cocaine in Warren's automobile and office, but stated that he could not be specific because "I don't really know." "I can't remember, it's been so long ago." "Six years ago. It's been awhile."

Kenneth Piggee also testified that in November, 1990, that he made a trip to Houston, Texas to purchase cocaine for Excel Warren; that while returning to Arkansas, he was stopped by a Texas Highway Patrolman for improper license tags and while being interviewed by the officer, cocaine was discovered on the rear seat of the vehicle. Kenneth Piggee entered a plea of guilty to the charge of possession of cocaine with intent to distribute and was sentenced to a term of five years and three months incarceration.

Kenneth Piggee further stated that after his arrest, his wife immediately contacted Warren and obtained approximately $10,000.00 with which to secure the services of an attorney and to post a bail bond. The testimony of Kenneth Piggee was received for the limited purpose of showing knowledge, intent, motive, and the absence of mistake or error.

A. I only did it when he told me to.

Q. Who?

A. Mr. Sanders.

---

**2.** On cross examination, Ronald Watson testified:

Q. ... Didn't you understand that you had to catch Excel Warren ... in order to get the deal that you were trying to cut?

A. Only time I contacted Excel Warren was the time he told me. That was once at my house and the time at my office. That was twice.

.    .    .    .    .

Q. You were trying to get something incriminating on him, correct? That's the whole purpose of this. That was you (sic) job, wasn't it?

On cross examination Kenneth Piggee could not recall whether he contacted Warren or Warren contacted him about making the trip to Houston to purchase cocaine. He further admitted that he gave the Texas officers false information about the identity of his wife and his home address and that he could not remember whether he either told the Texas officers or the Grand Jury, that a person by the name of Tina Gay gave him the telephone number to call upon arriving in Houston in order to communicate with the drug source. In responding to a question posed by defense counsel as to the purpose of giving false information about his address and his wife's name, Kenneth Piggee replied, "Everybody lies."

Tina Piggee:

Tina Piggee, the wife of Kenneth Piggee and former secretary of Excel Warren, testified that she had worked as a secretary and office manager in Excel Warren's insurance agency for approximately three years; that when she learned that her husband had been arrested in Texas for possessing drugs, she immediately contacted Excel Warren and obtained $5,000.00 initially in order to make arrangements for her husband's release; that she later received an additional $5,000.00 from Excel Warren for attorney fees for her husband and an additional $5,000.00 to be used to assist an associate of her husband, Gregory Matthews, who was also arrested by the Texas authorities; that she learned that her husband did not give the Texas authorities her correct name and his correct home address; that she has a cousin, Deborah Henry, who resides in Houston, Texas; and that her husband did not advise her in advance that he was going to Houston, nor about the purpose of the trip.

Tina Piggee testified further that during her three year tenure at Excel Warren's insurance agency she had never seen "any huge amounts of money other than the money that came in over the counter" and that she had never seen Excel Warren in possession of any large sums of money other than what was generated by the business. Furthermore, she neither observed drug activity at the office nor saw Excel Warren in possession of any drugs. She also stated that

Excel Warren never talked to her about drugs.

Tina Piggee stated that her husband had a friend, Vincent Johnson, who, at one time, worked for Cali Plus Body and Paint shop that was managed by Ronald Watson and that her husband visited this friend at the shop on occasions.

Michael L. Smith:

Michael L. Smith, a supervisory special agent of the F.B.I. testified that a wire tap was placed on two telephones, a cellular mobile phone and a phone in an apartment, in the name of Keith Williams also known as Keith Walker who was trafficking in cocaine in Little Rock. The taps were installed on March 1, 1993, and discontinued on May 13, 1993. Special agent Smith testified that based on information received from a conversation between Keith Williams and a supplier in California, the Government arrested Larry McNeil on May 15, 1993, who arrived in Little Rock from California with 25 kilograms of cocaine hidden in a concealed compartment of a vehicle parked on a lot near Keith Williams' apartment; and that Keith Williams was arrested also.

Special agent Smith stated that during the period that Keith Williams' phones were taped, thousands of telephone calls were recorded; that two calls have been identified as calls associated with Excel Warren; that the first call, identified as number 6, "involves a conversation between Eric Childress, who was another of Keith Williams' runners, Excel Warren, and Keith Williams;" and that tape 7 involves a conversation between "Eric Childress, one of Keith Williams' runners, and Excel Warren." A call designated as number 8 is a conversation between Eric Childress and Keith Williams.

on cross examination, Special Agent Smith testified as follows:

Q. In your review of some of these tapes did you get the indication that Mr. Williams was both buying insurance or had bought insurance from Excel Warren and also was talking about renting a house or leasing a house from [him]?

A. Yes, it's clear that some of the conversations, or a portion of some of the conversations, had to do with Mr. Williams attempting to locate a residence. It is clear that he wanted to find some other place to move his operation, and Mr. Warren I believe was helping him with that.

. . . . .

Q. Would you not agree that previous reviews didn't indicate any (calls from Excel Warren to the cell phone)? They were all calls between the home phone and the office number?

A. I believe that's going to be correct. . . .

Eric Childress:

Eric Childress was arrested in April, 1994, and subsequently entered a plea of guilty to conspiracy to possess with intent to distribute cocaine. Pursuant to a plea agreement with the Government, the Government recommended sixty months of incarceration in exchange for his agreeing to cooperate and assist the Government in an ongoing drug investigation. The applicable range of incarceration was a range of 121 months to 151 months.

Childress testified that he began working for Keith Williams in the fall of 1989 and that his job consisted of bringing cocaine to Little Rock from Los Angeles and then returning to Los Angeles with the money.

Childress stated that he was led to believe by Keith Williams that Excel Warren was a cocaine customer of Keith Williams; that Keith Williams advised him that Excel Warren was supposed to deliver money for cocaine that Warren had received earlier; that he first met Excel Warren when "we went to his office to purchase some insurance for a load vehicle" which is used to transport cocaine; that the only dealing he had with Excel Warren was in 1992 when Warren came to Keith Williams' apartment and left $3,000.00; that Keith Williams had advised him that Warren would come to the apartment, during his absence, "to drop something off and pick something up;" and that the "something was cocaine—one or two keys,"

but he never delivered any drugs to Excel Warren.

On cross examination, Eric Childress stated that he had never delivered cocaine to Excel Warren and never saw him pick up anything at Keith Williams' apartment; that at the time, Excel Warren extended insurance coverage on vehicles for Keith Williams; and that these vehicles were new and converted to cocaine haulers later on.

Larry McNeil:

Larry McNeil testified that he first became involved in drug trafficking during the first part of 1991, when he was hired by Ricky Carter to deliver drugs from California to Virginia. In 1992, Ricky Carter recommended him to Keith Williams who needed a driver and he came to Arkansas to work for Keith Williams; that he would take money from Arkansas to California and return with drugs; and that he was arrested in Arkansas in May, 1993, and was later indicted in Arkansas and Virginia on drug charges and entered a plea of guilty to the charges. McNeil stated that he entered into a plea agreement with the Government whereby he agreed to cooperate and assist the Government in an ongoing drug investigation; and that in consideration for this assistance, the Government, during sentencing, recommended a seven year term of incarceration as opposed to "14 to 15 years" provided for under the law.

McNeil stated that he first met Excel Warren in May, 1992, when Warren visited the apartment of Keith Williams; that Keith Williams introduced Excel Warren to him as B. J.; that Excel Warren delivered a bag containing money to Keith Williams; Excel Warren left the apartment and that he, Larry McNeil, immediately made preparation to leave for California, since this was the last sum of money to be reported before his departure; that the money was in payment of drugs delivered to Excel Warren earlier; and that the amount delivered was approximately $25,000.00 to $30,000.

McNeil testified that in January, 1993, Excel Warren came by Keith Williams' apartment, during his absence, and asked if Keith Williams had left a package for him; that he, Larry McNeil, went to a closet, picked up a

shoe box and delivered it to Excel Warren; and that a few days later, Excel Warren returned to the apartment and delivered a bag containing money to Keith Williams and that he took steps immediately to depart for California.

On cross examination, Larry McNeil admitted that in cooperating with and assisting the Government in the ongoing drug investigation that he had never mentioned Excel Warren or implicated Warren until "about two months ago;" and that in exchange for his testimony in this proceeding, the United States Attorney in Virginia promised to write a letter in his behalf recommending a reduction in the sentence previously imposed.

Jo Ann Williams:

Jo Ann Williams, a former exotic dancer at the Bull Durham Bar, testified that she first met Excel Warren at the Bull Durham Bar in late 1990 or early 1991, and purchased cocaine from Warren; that she would purchase an eighth of an ounce or sixteenth of an ounce and paid approximately $250.00 for this amount and would sell some of the drugs; that she eventually increased the amount purchased from Excel Warren to an ounce and would pay for the drugs later; and that she and her husband insured their automobile with Excel Warren's insurance business.

On cross examination, Jo Ann Williams admitted that the Bull Durham Bar was in effect a "strip joint" and that the Government had granted her immunity in exchange for her testimony in this action.

Allen Williams:

Allen Williams testified that he knew Excel Warren and started purchasing cocaine from him in late 1990, which ranged in quantity from a sixteenth of an ounce to an eighth of an ounce ranging in cost from $125.00 to $225.00; that he would arrange for his purchases by calling Excel Warren at his business office; that he increased the quantity purchased up to an ounce; that he insured his automobile with Excel Warren's insurance business; that Excel Warren had loaned him $3,000.00 to purchase sound equipment and that the loan had not been repaid; and that the Government has grant-ed him immunity in return for his cooperation.

On cross examination, Allen Williams denied that he ever made accusations to either his wife or Excel Warren regarding his suspicions of an ongoing relationship between the two.

Sergeant Don Sanders:

Sergeant Sanders testified that he initiated an investigation of Ronald Watson in 1990 for distribution of cocaine; that the investigation expanded to the source side of the distribution; that in 1992, Ronald Watson signed a plea agreement prior to Ronald Watson being arrested whereby Watson agreed to plead guilty to a conspiracy charge involving the distribution of cocaine as well as a money laundering charge; and that in exchange for his cooperation and assistance to the Government, the Government, during sentencing, would advise the Court of his assistance and would recommend a term of incarceration in the range of five years. However, in June or July of 1993, the Government learned that Ronald Watson had made several distributions of cocaine in violation of his plea agreement; and that a second plea agreement was negotiated resulting a commitment to recommend a term of ten years in the penitentiary as opposed to five years under the initial agreement.

Sergeant Sanders stated further that Ronald Watson was paid a total of $9,200.00 by the Drug Enforcement Administration and $600.00 by the Federal Bureau of Investigation; and that these funds were used to relocate Watson outside of Little Rock.

When asked why people cooperate with the Government in an ongoing investigation, Sergeant Sanders gave the following response:

> A. . . . . Some come forth because they feel like it's the right thing to do. Some come forward for revenge purposes, they are angry at someone, but most come forward as a result of being arrested in hopes of either getting some kind of leniency or sentence reduction on a pending charge.

On cross examination, Sergeant Sanders testified as follows:

Q. To your knowledge was Excel Warren ever found in possession of any amount of drugs?

A. Not that I'm aware of.

Q. Or was he ever found in possession of large sums of money?

A. Not that I'm aware of.

The following witnesses, including the defendant, testified during the defendant's case in chief:

Michael Anthony Robinson:

Robinson, who has been an associate with defendant in the insurance business for approximately ten years and is a member of the same church that Warren attends, testified that he has never seen cocaine or "trappings of wealth or anything like that" around defendant's home or office.

Brenda D. Warren:

Brenda D. Warren, who was married to defendant from 1990 to 1996 and lived with him until 1994, testified that during their marriage there was never any cocaine in the home; that the largest sum of money that she observed in the possession of defendant was approximately $800.00; and that while defendant was the only one working in the household, their financial standing was basically stable although on occasions they would get behind on the house note and telephone service would "get cut off sometime."

Richard Talley:

Richard Talley, a resident of Detroit, Michigan, and a brother of Ronald Watson, testified that he volunteered to come to Arkansas to testify for defendant and that defendant paid the air fare for the trip.

Richard Talley stated that in 1990, his drug use had caused many personal and family problems and his wife called defendant from Detroit and requested defendant to assist Richard Talley in resolving the drug problem; that in response to the request, defendant invited Richard Talley to come to Arkansas and reside with defendant's family and to affiliate with his church; and that defendant assisted Richard Talley in getting drug treatment and counseling and organizing a refurbishing business in order to create employment for Talley.

Richard Talley further testified that his brother, Ronald Watson, "is not a very trustworthy person and he's a liar;" and that when he learned that defendant was going to open an automobile paint and body repair shop with Ronald Watson in a joint venture, he advised defendant not to do so in order to avoid being "hurt by my brother."

Richard Talley stated that his brother, Ronald Watson, has been in the drug business since 1971; that his brother played a role in creating and sustaining his drug problem by supplying drugs; and that during the two year period that he had "almost daily contact with Excel Warren," he never observed any drug activities, suspicious circumstances or unusual amounts of money either at Excel Warren's home or insurance business.

Vincent Johnson:

Vincent Johnson testified that Excel Warren and Ronald Watson organized an automobile body repair shop called "Cali Plus" in 1991; that he was employed as a repairman; that Ronald Watson wrote the checks in meeting financial obligations of the business; that there were occasions when the business had taken in large sums of money, then suddenly there were no funds available to pay creditors and Excel Warren supplied funds from his insurance business in order to meet the obligations; that an agreement was entered into between Excel Warren, Vincent Johnson and Ronald Watson whereby Watson would leave the business and sell his interest in tools to Warren and Johnson; and that pursuant to the agreement, a $500.00 down payment was made to Watson, but on a later date, without authorization, Ronald Watson entered the business and took possession of the tools and failed to return them on demand resulting in steps taken by Excel Warren to have Watson prosecuted by registering a complaint with the prosecuting attorney's office.

Excel Warren:

Excel Warren, the defendant testifying in his own behalf, testified that he has an insurance business that extends coverage on automobiles, homes and bond dealers; that he has a charter bus business that offers trans-

portation service to church groups and children's ball leagues; that he has a business of leasing and selling apartments and homes; that he has never been convicted of a felony; and that he never purchased any drugs from Ronald Watson or anyone.

Excel Warren further stated that he and Ronald Watson entered into a paint and automobile repair venture in 1990 or 1991; that the business was productive given the fact that his insurance business sent numerous repair jobs to the repair shop; that Ronald Watson was the manager and handled the financial affairs of the repair shop; that while he was supposed to share in the profits, he never received any funds, but was required to use funds from his insurance business to pay employees' salaries, utility bills and rent; that the relationship between him and Ronald Watson deteriorated to such a degree that it was decided that Ronald Watson would leave the repair business and sell his interest in tools to him; that while a $500.00 payment was made to Watson on the purchase of his interest in the tools, Watson, without authorization, removed the tools from the shop; and he took steps to have Ronald Watson prosecuted.

Relative to the April 2, 1993, visit to Ronald Watson's home which was video taped, Excel Warren testified as follows:

A.  So when Ronnie approached me and asked me would you get me some narcotics my idea was Hey, look, this is probably the only chance I'll ever have to collect my money from this guy. What I did, when he told me that, I said if I can get my hand on this money, you'll catch hell getting it back, and I was just so—he had messed up my (sic) with Mr. Phillips as far as the I take care of business. He's almost bankrupt my insurance company, he's just done everything he could, and that's the only way I feel I could get my hands on any of that money back.

Excel Warren stated that he never purchased drugs from Keith Williams and that their relationship involved insurance coverage on approximately six vehicles owned by Williams; that the telephone calls that were taped related to a house Warren was trying to sell Williams; and that the $1,500.00 that he delivered to Williams' apartment was a deposit that Williams had made for the leasing of a house which was never consummated.

In response to the testimony given by Larry McNeil, Excel Warren testified as follows:

A.  I've never seen that guy in my life.

    .       .       .       .       .

Q.  His testimony about you picking up a shoe box which he presumed to have drugs in it?

A.  That's a flat lie.

Warren also testified that he has never "physically possessed" $24,000.00 or $35,000.00 in cash nor paid that much money to "anybody for anything."

Replying to the testimony of Jo Ann Williams and Allen Williams, Warren denied that he sold cocaine to the Williams or used it with them; that he met Jo Ann Williams at "Bull Durham Bar, a strip joint" and met her husband, Allen, at a later time; that he loaned Allen $350.00 not $3,000.00, as Allen testified, to assist him in establishing a business; and that Allen Williams had accused him of "having an affair" with Jo Ann Williams, his wife.

In responding to the testimony of Kenneth Piggee, Warren testified that during the noon hour, on the day that Kenneth Piggee was arrested in Texas, Warren answered a phone call and Kenneth was on the line and asked to speak with Tina Piggee, his wife; Warren stated that he advised Kenneth that Tina had taken the lunch break and was not available; that Kenneth simply advised him that he, Kenneth, had been arrested in Texas; that he advised Tina of the phone call and offered to assist them financially as he had done on previous occasions; and that he did not send Kenneth to Houston, Texas to purchase narcotics.

Warren testified further that after he was indicted, involved in a divorce proceeding, and while on supervised release pursuant to a personal recognizance bond, he used cocaine for the first time during a social func-

tion, at his girl friend's home, in the latter part of 1994 or 1995; and that he voluntarily advised his probation officer of the infraction.

## DISCUSSION

Inasmuch as a motion for new trial based on newly discovered evidence is not looked on favorably and, further, recognizing the need for the finality of a judgment, on the one hand, and the acceptance of the Court's obligation to minimize injustice and being mindful of the vested right of a defendant to due process of law, on the other hand, this Court, in considering the issue presented, has cautiously and heedfully reviewed the entire testimony contained in the transcript and reached the conclusion that aside from the testimony of Delbra Heron there is no testimony proffered by the Government to show that defendant either possessed drugs or attempted to possess drugs that is free of the badges of "revenge, hopes of either getting some kind of leniency or sentence reduction", or self-preservation—a grant of immunity—and envy.

Delbra Heron's trial testimony, as argued by defense counsel with great force and earnestness, was forcible and persuasive in refuting Warren's persistence throughout the trial that he never possessed drugs nor attempted to possess drugs. Additionally, Delbra Heron's testimony was a major factor in the jury finding that the Government had established defendant's guilt of the charges beyond a reasonable doubt. However, Delbra Heron's trial testimony was inaccurate and misleading.

█ Delbra Heron's recantation, in this Court's opinion, is legitimate and untainted with duress or bribery and, accordingly, not designed to defeat the ends of justice. Delbra Heron concedes that her testimony was inaccurate and that she did not have the benefit of all the facts in expressing her opinions and beliefs when she testified during the trial.

While it is readily apparent that defendant's motion for a new trial is pursuant to Rule 33 of the Federal Rules of Criminal Procedure, the circumstances in this action are different from the typical reasons asserted for a new trial based on newly discovered evidence allegedly affecting the credibility of the Government's witness at the trial. Here, Delbra Heron reached a conclusion about what happened to drugs that had been discovered in her garage without the benefit of all the relevant facts; she in good faith assumed that the defendant entered her garage alone and immediately after his departure, it was discovered that the drugs were no longer in her garage; and she concluded that defendant had taken possession of the drugs.

The record reflects that Delbra Heron was neither interviewed before she was called as a witness for the Government nor was her testimony carefully appraised as to whether it was supported by other evidence before being proffered by the Government. The following exchange took place with defense counsel and Delbra Heron during the February 28, 1997, hearing:

Q. ... Ms. Herron, you appeared sort of at the last minute at the trial of Excel Warren, correct?

A. Yes, sir.

Q. The government came to your office with a subpoena and brought you to the Court house?

A. Yes.

Q. ... Had you had any notice of that prior to them showing up?

A. No.

Q. ... You were brought to the Court house and placed in the room here, is that correct?

A. Yes.

Q. Did you have the opportunity to discuss with anyone what you knew about Excel Warren and the man that had previously lived at your house? .

A. No.

Q. Did you ever visit with Ms. Harris (prosecuting attorney) here prior to your testimony?

A. No.

Delbra Heron further admitted that Talley, while residing in her home, had resumed the use of cocaine near the time drugs were discovered in her garage.

This Court is persuaded that in reviewing the testimony of the Government's key witnesses, objectively, and in connection with other relevant facts, the Government's evidence merely creates a suspicion at most that Excel Warren was involved in drug activities as charged. The evidence reflects that Warren sold and extended insurance coverage on vehicles owned by Keith Williams, and on an occasion, returned a cash deposit Keith Williams had made pursuant to an agreement to either lease or purchase a dwelling house; that Ronald Watson, the Government's key witness, had caused Warren to lose great sums of money in an automobile repair venture that the two had entered into; and that Excel Warren was seeking to recover some of his losses by pretending that he would deliver a quantity of drugs for an agreed sum of money tendered in advance and that Warren took steps to have Ronald Watson prosecuted for the alleged unauthorized possession of tools sold to Warren.

It must be remembered that Sergeant Sanders testified that during the ongoing drug investigation, which extended approximately from 1990 to 1993 or 1994, Excel Warren was never found in possession of either drugs or large sums of money. Richard Talley, brother of Ronald Watson, testified that Ronald Watson is not trustworthy and is a liar and was engaged in drug trafficking as early as 1971, but during his "almost daily contact with Excel Warren" for approximately two years, he never observed any drug activities, suspicious circumstances or unusual amounts of money either at Excel Warren's home or insurance business.

The Court is persuaded that where, as here, the material evidence upon which a verdict of guilty is grounded, and without which a guilty verdict, in all likelihood, would not have been rendered, and such evidence is inaccurate and misleading, the verdict is not only inherently unfair, but compromises judicial integrity and, accordingly, a new trial is warranted. See: *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972) (stating, in essence, that a new trial is required if the inaccurate testimony could in any reasonable likelihood have affected the judgment of the jury); *Mesar-*

*osh v. United States,* 352 U.S. 1, 9, 77 S.Ct. 1, 6, 1 L.Ed.2d 1 (1956) (stating that the dignity of the United States Government will not permit the conviction of any person on tainted testimony that is material to the question at issue); *United States v. Lisko,* 747 F.2d 1234, 1237 (8th Cir.1984) (stating that newly discovered evidence relied upon in seeking a new trial must not be *merely* cumulative or impeaching, but must be material to the issues involved and be of such nature that the evidence would probably produce an acquittal on a new trial).

It is, therefore, the order of this Court that the verdict and judgment entered pursuant to said verdict are hereby set aside and held for naught and defendant's request for a new trial is granted.