UNITED STATES of America

v.

Marshall Lewis KING and Bruno Lewis Crutchfield

No. CR. 300CR109.

United States District Court,
E.D. Virginia,
Richmond Division.

Nov. 18, 2002.

See also 39 Fed.Appx. 15.

David T. Maguire, Esquire, Michael C. Wallace, Esquire, Assistant United States Attorney, Richmond, VA, for Government.

Matthew P. Geary, Esquire, Old City Hall, Richmond, VA, for King.

Michael Morchower, Esquire, Morchower, Luxton and Whaley, Richmond, VA, for Crutchfield.

## MEMORANDUM OPINION

PAYNE, District Judge.

This case is before the Court on the Motion for Reconsideration of the Order

entered herein on July 9, 2002 granting the Motions for New Trial filed under Fed.R.Crim.P. 33 by Marshall King and Bruno Crutchfield. After the United States filed its Motion for Reconsideration, King, Crutchfield and the United States developed significant additional evidence pertinent to whether a new trial was appropriate. Hence, briefing on the Motion for Reconsideration was deferred so that the United States could supplement its motion and the defendants could respond thereto.

As a consequence, the real issue before the Court at the hearing held on September 23 and 24, 2002, was whether a new trial was appropriate. Additional evidence was presented at that hearing; argument was heard; and an oral decision was rendered. As promised, this Memorandum Opinion confirms and further explains the decisions granting the Motions for New Trial filed by the defendants and denying the Motion for Reconsideration filed by the United States.

## PROCEDURAL HISTORY

King and Crutchfield were tried in November, 2000 on a thirteen count Second Superseding Indictment in which they and a third defendant, Michael Wilkins, were charged with various drug trafficking crimes. Count One charged a drug conspiracy against King and Crutchfield. Count Two charged King with misprision of a felony. Counts Three, Four and Thirteen charged King with distribution of crack cocaine. Counts Five and Eight charged Crutchfield with distribution of crack cocaine. Counts Six and Seven charged King and Crutchfield with distribution of crack cocaine. Count Nine charged Wilkins with distribution of crack

cocaine. Count Ten charged Crutchfield with inducing interstate travel to facilitate interstate drug trafficking activity. Counts Eleven and Twelve charged King and Crutchfield, respectively, with carrying a firearm during and in relation to a drug trafficking crime.

Motions for judgment of acquittal, under Fed.R.Crim.P. 29, were granted as to Count One against Wilkins, Count Eight against Crutchfield, Counts Eleven and Thirteen against King, and Count Twelve against Crutchfield. The jury, therefore, was asked to decide Counts One and Ten as to King and Crutchfield; Counts Two, Three and Four as to King; Counts Five, Six and Seven as to Crutchfield; and Count Nine as to Wilkins.

The jury convicted King and Crutchfield of Count One and King of Count Two. It acquitted on all other charges submitted to it, viz., Counts Three, Four, Five, Six, Seven, Nine and Ten. Those seven counts mirrored the overt acts charged in the conspiracy charge, Count One,[1] and the evidence presented respecting those counts also constituted a substantial part of the prosecution's case on Count One.

The presentation of evidence spanned four days. In its case-in-chief, the United States presented twenty witnesses, all but six of whom were drug dealers or drug addicts or both, and most of whom testified under grants of immunity or pursuant to cooperating plea agreements, with hopes of sentence reduction. The United States presented the testimony of six law enforcement officers who testified on matters peripheral to, but supportive of, in a general way, some of the testimony of the other witnesses.

---

1. Notwithstanding that commission of an overt act is not an element of a drug conspiracy under 21 U.S.C. § 846, *United States v. Clark*, 928 F.2d 639 (4th Cir.1991), the United States, as it often—but unnecessarily—does, alleged overt acts in the drug conspiracy charged in Count One.

The defense called seventeen witnesses, mostly to testify about the defendants' character, but some witnesses addressed factual matters. One expert was presented to explain the effects of cocaine on the human memory. In its rebuttal case, the United States called six witnesses, all of whom were directed to impeach or rebut the testimony given by King.

Closing arguments were given on November 17, and the jury was sent home for the week-end. On November 20, the jury was instructed and deliberated for six hours, resuming deliberations for three hours the next day, November 21, and returning its verdict on that day. On April 16, 2001, King and Crutchfield were sentenced to 188 months imprisonment, and to 151 months imprisonment, respectively.

### STATEMENT OF FACTS

At all times relevant to the charges, Crutchfield was the Chief of Police (and the only police officer) in the small town of Broadnax, in southern Virginia and King was a Virginia State Trooper who worked and lived in the same general area. In essence, the Second Superceding Indictment alleged that King and Crutchfield were "dirty cops" who had conspired to distribute, and had distributed, cocaine base, and who knowingly and willfully had concealed their knowledge of extensive drug distribution activities of others with whom they associated. It also was alleged that both defendants used drugs to secure sexual favors from the drug-addicted women whose testimony was the basis for Counts Three through Ten and for many of the overt acts alleged in Count One.

### A. The Trial Evidence

The trial was vigorously contested. Because all prosecution witnesses, other than law enforcement officers, were heavy drug users or addicts or were people testifying under grants of immunity or pursuant to cooperating plea agreements with the attendant hope of securing reduced sentences, the case was a close one.

The single most important witness offered by the United States, on the charges of which King and Crutchfield were convicted, was Vincent Maurice Lewis, King's nephew, who was a substantial and long-time, albeit young, drug dealer who operated in the area allegedly under the protection of King and Crutchfield. Much of the drug trafficking activities to which Lewis testified were, according to him, conducted with the knowledge and protection of King and, to a lesser extent, Crutchfield. Detrone Williams, Shawn Archie and several heavily addicted drug users or dealers also gave testimony probative of Count One.

Apart from Lewis, Williams and Archie, there were four principal prosecution witnesses. Carnell Meredith gave detailed testimony about drug dealing by Lewis, thereby corroborating Lewis's testimony on that topic. But, Meredith's testimony about King's involvement, or acquiescence, in Lewis's drug dealing was more favorable to King than to the United States. Indeed, Meredith essentially admitted that, although King was present at the site of drug dealing at Lewis's grandmother's house, the drug dealing was not done in King's presence.[2] Meredith offered nothing probative of Crutchfield's guilt of Count One. The testimony of Maurice Harvey can be similarly described.

Willie Lee Hicks and Carnell Johnson offered evidence probative of the guilt of King on Count One. Hicks did not implicate Crutchfield in the alleged conspiracy but Johnson did. However, the testimony

---

**2.** It should be noted that Archie's recantation corroborates that aspect of Meredith's trial testimony while Archie's trial testimony is to the contrary.

of Johnson also supported the view that King and Crutchfield were involved in police work, by using a drug user to investigate his suppliers, when they dealt with Johnson. The jury did not find credible the testimony of the several drug-addicted women who testified to the substantive counts that also were alleged as overt acts in Count One.

Notwithstanding that a number of other witnesses testified to evidence probative of Count One, Lewis was the cornerstone of the prosecution's case. That is because Lewis's testimony was offered to describe events across most of the time-span of the alleged conspiracy and supposedly was based on a close working and personal connection to King, and through King, to Crutchfield. No other witness purported to know all, or even most of, the inside details to which Lewis testified. The significance of Lewis's testimony was described in the prosecutor's closing argument, "[h]e [Lewis] put it out there enough to get beyond that question of reasonable doubt . . . . Then he [Lewis] did something different. He tied Bruno Crutchfield and Marshall King together in a neat package." November 17, 2000 Transcript, pp. 14–15 ("Nov. 17 Tr. p. ___").

Lewis's testimony was also the foundation of King's misprision of felony conviction because of his connection to King. No witness specifically corroborated Lewis's testimony about Count Two.

Shawn Archie offered evidence significantly corroborative of the conspiracy charge and so did Detrone Williams. Although the United States, in closing argument, emphasized their testimony as corroborative of Lewis, it now contends that neither witness was important.[3]

## B. The Motions For New Trial; The Hearing On July 8; And The Hearing On September 23–24

On April 3 and 24, 2002, the defendants moved for a new trial, relying largely on affidavit evidence from John Eric Hughes and Wayne Motley who averred that, before the trial, Lewis told them that he was going to present certain specifically described false testimony against King and Crutchfield to build a case against them so that his own sentence would be reduced. Each of those witnesses also averred that Lewis had asked them to tell lies similar to those which Lewis said that he intended to tell. Neither accepted Lewis's entreaty.[4]

Based on that affidavit evidence, the Court ordered that counsel for both sides be permitted to interview the affiants and directed that an evidentiary hearing be held. Those witnesses testified on July 8, 2002. So too, did Lewis and Williams, another witness who allegedly lied at the instance of Lewis. By Order entered on July 9, 2002, for reasons summarized from the bench on July 8, the defendants' Motion for New Trial was granted.

On July 11, 2002, the United States moved for reconsideration of the order granting a new trial. Like the trial, the evidentiary hearing on the Motions for New Trial was well-reported in the press. As a result, other witnesses came forward to report that Lewis also had told them that he was going to lie and had asked them to do likewise. At the instance of all parties, the testimony of the newly identified witnesses was heard on September 23 and 24, 2002, along with argument on the Motion for Reconsideration. The evidence adduced at the hearings of July 8 and September 23 and 24 requires further ex-

---

**3.** It is true, as the United States says, that the jury acquitted King of a distribution charge involving Detrone Williams (Count Three), but Williams's testimony transcended that one event.

**4.** By Memorandum Opinion and Order entered on May 29, 2002, the Court of Appeals affirmed the convictions.

plication so that it can be analyzed under the applicable legal standards.

## 1. The July 8 Hearing

At the hearing held on July 8, the defendants presented the testimony of John Eric Hughes, one of the individuals whose affidavits had been appended to the motions for new trial. Before the much-publicized trial of King and Crutchfield, Hughes was incarcerated with Lewis at the Pamunkey Regional Jail. Later, Hughes was incarcerated at Fort Dix where he met King and informed King about the conversations he had with Lewis before the trial while at the Pamunkey Regional Jail. King communicated that information to his counsel who then interviewed Hughes. The Hughes affidavit ensued that interview.

Before describing the testimony that Hughes gave on July 8, it is appropriate to note that, in his affidavit, Hughes reported that, approximately one week before the trial of King and Crutchfield, he had written letters to the Honorable James R. Spencer, a judge of this Court, and to the undersigned judge describing the false testimony that he believed Lewis and Williams were going to give at trial. A copy of Hughes's letter to Judge Spencer was located in the case file in *United States v. John Eric Hughes*. The *Hughes* file and the file in this case have been searched and there is no record of any letter to the undersigned judge from Hughes.

However, in the letter to Judge Spencer, Hughes said "I see how they are prosecuting those black officers from Broadnax [King and Crutchfield] with testimonys [sic] that I know are lies because I was offered the opportunity to go along with these lies to get my sentence down to a couple of years." Additionally, after advising Judge Spencer that he had written the undersigned judge to the same effect, Hughes explained that he had written "of the people who are lying that I know of to get a sentence reduction." He also averred in his affidavit that: "I told in the letter of others who had met Vincent Lewis for the first time here in jail who had taken the opportunity to give false testimony—statements on these officers to get a lesser sentence." Rather obviously, the text of the letter that was sent to Judge Spencer corroborates the testimony given by Hughes about the letter sent to the undersigned even though that letter apparently did not reach its destination.[5]

On July 8, Hughes testified that, before the trial of King and Crutchfield, he was talking with Lewis in the Pamunkey Regional Jail where they both were confined. The topic of conversation was the pending trial of King and Crutchfield. Lewis informed Hughes that the only way you "could beat the Government" was to work with the Government and to "tell on somebody or testify on somebody." (July 8 Tr. 49). Lewis advised Hughes that it made no difference whether the testimony was "true or not" because either way it "would get your sentence reduced." *Id.* Lewis then advised that he was going to testify falsely about the "cops down in Mecklenburg" and Lewis said that Hughes could do the same and that would help reduce Lewis's sentence as well as Hughes's own

---

5. *As explained in the transcript of the July 8 hearing, it is the practice of the undersigned judge to send letters of that sort to counsel of record and to place the original thereof in the file. Because the original is not in the file and because counsel did not receive copies of such a letter, it appears that, for reasons unknown, the letter was not actually delivered* to the undersigned judge. Nor does the undersigned judge recall reading such a letter and, considering its asserted substance, it is likely that, if such a letter had been received, its text would have been recognized as significant, and thus, would have been sent to all counsel.

sentence.[6] Lewis informed Hughes that "all I [Hughes] had to do was say that he [King] gave me advanced notice on raids, that he would give us advanced notice on road checks, he—that he would supply us with cocaine and that he would keep us from getting arrested." (July 8 Tr. 50).[7] That, of course, is a significant part of the testimony actually given at trial by Lewis.

Additionally, Hughes heard Lewis talking to Detrone Williams about plans for Williams to testify falsely. (July 8 Tr. 52). Hughes heard Lewis tell Williams "that all he [Williams] had to do was to say that he got stopped, he—drugs were confiscated and that he [King] promised to let him [Williams] go as long as he [Williams] started dealing for him [King]." (July 8 Tr. 53). Although Williams actually testified to that effect at trial, later, while watching a television news program covering the trial, Williams admitted to Hughes that he did not even know King and Crutchfield, whose pictures were shown on the television news program. (July 8 Tr. 53–55).

The defendants also supported their motion for new trial with an affidavit from Wayne Motley who also testified on July 8. Motley and Lewis were confined in the same facility before the trial of King and Crutchfield. On July 8, Motley testified that Lewis informed him that he was "going to set up" [some officers]—make it look like he was innocent and they were guilty so that he could get his sentence reduced. (July 8 Tr. 120–21). According to Motley, Lewis advised that his [Lewis's] sentence might be reduced even more if

Motley were to give corroborating testimony. (July 8 Tr. 122).

After the trial, Motley met King while both were incarcerated and informed King that Lewis had told Motley "that he was going to get his case switched over to try to testify and give lie testimony on you [King] saying that you [King] was going to give him—let him through roadblocks and different other things." (July 8 Tr. 123–24). When asked what particular lies Lewis had said that he was going to tell, Motley said that "the two things mainly was he said that he [Lewis] was going to lie and say that Mr. King was doing raids on a task force or something and taking drugs and then giving them back to them was one of them and then there was another thing saying letting him [Lewis] get by with a roadblock." (July 8 Tr. 124). Motley also overheard Lewis discussing what Motley understood to be a plan for another witness to give false testimony when he heard Lewis and a person named "D" from New York say "they was going to switch it over to make it look like he [King] was the one that—that was doing all the distributing and all the other stuff to get him [King] in trouble because he was a cop and make him look bad." (July 8 Tr. 125–26). Again, according to Motley, Lewis said that Motley's sentence could be reduced as well, if he would give similar false testimony. (July 8 Tr. 137).[8]

## 2. After The July 8 Hearing

The testimony at the July 8 hearing, and a subsequent hearing on a bond request

---

**6.** Although the focus of Lewis's conversation with Hughes attempting to induce Hughes to give false testimony was directed toward King because Hughes was from the same area as King, the record is clear that Lewis was talking about giving false testimony as to both officers, *i.e.,* King and Crutchfield.

**7.** The same testimony was repeated in one form or another in several different places

during direct examination, cross examination and re-direct examination. It will not be repeated here. *See* July 8 Tr. 51–52, 61, 78, 80–81, 88–89, 103–04.

**8.** The identity of the person referred to as "D" is unknown, but, after having seen Williams at the July 8 hearing, Motley said that Williams was not "D."

filed by the defendants and held on July 22, created considerable publicity. As a consequence, a prisoner whose case was pending before another judge of this Court wrote to that judge to advise that he had information confirming what Hughes and Motley had said about Lewis. The Court required counsel to interview that witness, Isaac Davis, and he, in turn, identified another witness, his brother, Carlos Davis, who reported a similar experience with Lewis. Counsel for King conducted further investigations and identified another witness, Shawn Archie, who admitted that he had lied during his testimony at the trial. Testimony of those three additional witnesses, *inter alia*, was received at a hearing held on September 23 and 24.

### 3. The Hearing On September 23 And 24

Isaac Davis and Lewis had been involved in narcotics dealings in the mid-1990's. (Sept. 23 Tr. 78). They encountered each other again in November 2000 at the FCI Petersburg where Lewis was housed as he was en route to another facility. During a conversation about their respective incarceration status, Lewis advised Davis that he was going to lie in the trial of King and Crutchfield to get his sentence reduced. Lewis then asked Davis to "jump on the band wagon" or "jump on the case," explaining that all Davis had to do was to testify that Davis had seen King with Lewis in South Hill and that King witnessed a drug transaction (sale of one-half of a kilogram of cocaine) between Lewis and Davis. (Sept. 23 Tr. 81, 82). As part of that conversation, Lewis told Davis that " ' I'm looking at 20 years if they find me guilty of what I'm charged with. I'm looking at 20, but I'm not going to get 20.... So I'm going to do what I got to do.' " (Sept. 23 Tr. 83–84, 84–85).[9]

The defendants also presented the testimony of Carlos Davis, the brother of Isaac Davis, who first met Lewis in 1996 when Lewis and Isaac were involved in drug dealings together. Carlos also encountered Lewis in November 2000 in the FCI Petersburg where both Isaac and Carlos were confined at the time. Carlos heard Lewis tell Isaac "a way that he [Isaac] could probably get home if he actually, you know, just jumped on the case with these two gentlemen over there [King and Crutchfield]." To "jump on the case" meant to give false evidence to secure a sentence reduction. In the same conversation, Carlos heard Lewis say that "he [Lewis] would do what he had to do" to get home. (Sept. 23 Tr. 135–37).

Carlos Davis also was incarcerated at the Northern Neck Regional Jail with Detrone Williams before the trial here at issue. During that confinement, Williams confirmed to Carlos Davis that Lewis had enticed him to "get on the case" as a way of getting a sentence reduction. And, Williams advised Carlos Davis that he [Williams] was going to "jump on the case," notwithstanding that he did not even know Marshall King or Bruno Crutchfield. (Sept. 23 Tr. 140–43).[10]

---

**9.** Although Isaac Davis gave some contradictory evidence about when these conversations with Lewis occurred, Davis testified that, when he read about the July 8 hearing, he felt compelled to raise the matter with his trial judge (the Honorable Richard L. Williams, a judge of this Court) because he felt as if people had lied to convict him. Davis had nothing to gain in his own case by virtue of the letter he sent to Judge Williams or the testimony that he gave on September 23. The inconsistencies are the result of innocent error and go to unimportant details, and the Court credits the testimony of Isaac Davis as true, *albeit* not perfect.

**10.** In August 2002, Carlos Davis wrote a letter to the prosecuting Assistant United States At-

During the course of the investigation conducted after the July 8 hearing, counsel for King visited Shawn Archie in prison. At the time, Archie was incarcerated on a state charge.

Archie related to King's counsel that, in November 2000, he had been incarcerated at the Northern Neck Regional Jail with a number of the witnesses who testified at the trial of King and Crutchfield. Archie advised King's counsel that Lewis had coached a number of these witnesses, Detrone Williams, Juan Santos, Carnell Meredith and Willie Hicks, while they were in the holding area waiting to testify.

More importantly, during the interview with King's counsel, Archie recanted significant parts of his trial testimony. For instance, Archie related that King had stopped him on one occasion and advised Archie that he was aware of what Archie and Lewis and Williams were engaged in and said "if I catch you, you will go to jail." (Sept. 23 Tr. 169). Archie also told King's counsel that, on that occasion no money changed hands. That is diametrically opposite to what Archie had testified at trial. (Sept. 23 Tr. 169–70). At trial, Archie testified that King had stopped him and had taken $1,000.00 that Archie had intended to use to buy crack from Lewis. (Archie Trial Testimony, 46–50; Joint Appendix on appeal, 519–23).

Archie told counsel for King that King would not have been able to witness any drug transactions between Archie and Lewis. (Sept. 23 Tr. 168). At trial, Archie said that King was present during his drug deals with Lewis. (Jt.App. on Appeal, 514–19).

Archie advised counsel for King that he heard Lewis try to get other people involved in testifying in the case against King and Crutchfield, *inter alia*, mentioning Detrone Williams, Juan Santos, Carnell Meredith and Willie Hicks. Archie also related that he had communicated with Lewis after the trial and that Lewis had suggested to Archie, after a payment of $50, that he tell the lawyers for King that Archie could not remember his trial testimony. (Jt.App. on Appeal, 519–30).

Archie told counsel for King that law enforcement officers had offered him inducements, in the form of dismissal of charges, if he would testify on behalf of the prosecution against King and Crutchfield. At the trial, Archie testified that there were no such inducements. (Sept. 23–24 Tr. 14–22).

Having been informed by counsel about Archie's recantation of trial testimony and the admissions that he had perjured himself in several respects, the Court appointed counsel for Archie. Counsel advised Archie not to testify at the September 23 hearing, and Archie took that advice. Consequently, the Court permitted counsel for King to testify about the interview with Archie.

## 4. Other Assertedly Relevant Matters

As the United States asserts, there also was evidence that, at trial, King was impeached when he testified in his own behalf. In particular, King was shown to have filed false tax returns. And, it was shown that King had tried to have Erica Bennett, his girlfriend, make untrue, or partially true, statements to law enforcement officers investigating the case. The United States contends that this evidence should be considered in assessing the defendants' motions.

torney advising that he had not witnessed an incident in which Maurice Lewis had asked Issac Davis "to jump on the case." (Sept. 23

Tr. 144). Upon reflection, however, he decided that it was necessary to disclose what he knew. (Sept. 23 Tr. 154–56. 159–64).

The United States argues that, in considering the motion for new trial, the Court should consider evidence, offered on July 22, 2002, at a hearing on the defendant's request for bond pending the new trial that was ordered on July 9. The evidence pertained only to King, and the gist of it was that, after the July 8 hearing, King had Motley execute an untrue affidavit incriminating the lead investigator, George Austin, Jr. The false affidavit stated that Austin had told Motley to lie about his involvement with King. This, says the United States, must be considered in perspective of trial evidence that King tried to have his girlfriend, Erica Newton, lie for him when, before the indictment was returned, she was interviewed by law enforcement officers.

With the foregoing in mind, the merits of the Motions for New Trial and the Motion for Reconsideration will be considered.

## DISCUSSION

### I. The Applicable Legal Principles

The facts which form the predicate for the requested new trial call into play two tests for assessing such motions. Therefore, before considering the merits of the Motions for New Trial and the Motion for Reconsideration, it is necessary to ascertain the appropriate legal framework within which to analyze the issues therein presented.

### A. The Test Most Commonly Applied Under Rule 33

Fed.R.Crim.P. 33, entitled "New Trial", provides, in relevant part, that "[t]he Court on motion of a defendant may grant a new trial to that defendant if required in the interest of justice.... A motion for a new trial based on the ground of newly discovered evidence may be made only before or within two years after final judgment[.]" The defendants' motions are made on the ground of newly discovered evidence, and they were timely filed.

■ The test generally applied in this circuit when assessing motions for new trial on account of newly discovered evidence requires that a defendant satisfy each of the following five elements:

(1) the evidence must be, in fact, newly discovered, *i.e.*, discovered since the trial;

(2) facts must be alleged from which the court may infer diligence on the part of the movant;

(3) the evidence relied on must not be merely cumulative or impeaching;

(4) the evidence must be material to the issues involved; and

(5) the evidence must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

*Mills v. United States*, 281 F.2d 736, 738 (4th Cir.1960).[11] This test has its genesis in *Berry v. State*, 10 Ga. 511 (1851) and is followed in almost all jurisdictions where the fact pattern makes it applicable. 5 Wayne La Fave *et al.*, Criminal Procedure § 24.11(d) (2d ed.1999). Hereafter, it will be referred to as the *"Mills* test." In this case, it is undisputed that the first, second and fourth elements of the *Mills* test are to be resolved in favor of the defendants. Thus, the focus is on the third and fifth elements.

Although, as to the third element, "new evidence going only to the credibility of a

---

11. *United States v. Fulcher*, 250 F.3d 244, 249 (4th Cir.2001) (citing *United States v. Singh*, 54 F.3d 1182, 1190 (4th Cir.1995)); *United States v. Custis*, 988 F.2d 1355, 1359 (4th Cir.1993) (citing *United States v. Bales*, 813 F.2d 1289, 1295 (4th Cir.1987) and *Mills* ); *United States v. Chavis*, 880 F.2d 788, 793 (4th Cir.1989); *United States v. Lawhorne*, 29 F.Supp.2d 292, 304 (E.D.Va.1998).

witness does not generally warrant the granting of a new trial," [12] "there may be an exceptional 'rare case' that would justify granting a new trial solely on the basis of newly discovered impeachment evidence." *Custis*, 988 F.2d at 1359 (citing *United States v. Taglia*, 922 F.2d 413, 415–16 (7th Cir.1991)) (positing narrow hypothetical where government's entire case rested on uncorroborated testimony of single witness who, after trial, was discovered to be utterly untrustworthy on account of his consistent perjury in a string of previous cases). It also is true that impeaching evidence "may go so directly to the interest of the prosecution witness that, if his testimony was essential to the prosecution, a new trial should be awarded in which the interest of the witness may be shown." *United States v. McCoy*, 478 F.2d 846, 847 (4th Cir.1973); *see also United States v. Yosuf*, 508 F.Supp. 24, 27 n. 2 (E.D.Va. 1980) (acknowledging "that, under exceptional circumstances, newly discovered evidence impeaching the credibility of a witness might provide grounds for a new trial."); *United States v. Atkinson*, 429 F.Supp. 880, 885 (E.D.N.C.1977) (noting that "in some circumstances the newly discovered evidence, although impeaching[,] is sufficiently important in the ascertainment of the truth and in the interests of justice

that a new trial should be ordered.") (citing *Mesarosh* v. *United States*, 352 U.S. 1, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956)).

To satisfy the fifth element, the defendant must show that the probability of a different result is sufficiently strong to undermine confidence in the outcome of the trial in which the conviction was obtained. *United States v. Gonzalez*, 938 F.Supp. 1199 (D.Del.1996), *aff'd* 127 F.3d 1097 (3d Cir.1997). Put another way, the newly discovered evidence must be such that, on a new trial, there is a significant likelihood that the jury's verdict would be not guilty.

## B. The *Larrison* Test

However, "if the motion for a new trial is based on a witness's recantation of trial testimony, it is appropriate to apply what has come to be known as the *Larrison* test." Under *Larrison*, the motion should be granted if: (1) the court is reasonably well satisfied that the testimony given by a material witness was false; (2) the jury might have reached a different conclusion without the false evidence; and (3) the party seeking the new trial was surprised by the false testimony and was unable to meet it or did not know of its falsity until after trial. *Larrison v. United States*, 24 F.2d 82, 87–88 (7th Cir.1928).[13]

12. *Custis*, 988 F.2d at 1359 (citing *United States v. Stockton*, 788 F.2d 210, 220 (4th Cir.1986) and *United States v. Williams*, 415 F.2d 232, 233–34 (4th Cir.1969)); *see also United States v. Johnson*, 327 U.S. 106, 66 S.Ct. 464, 90 L.Ed. 562 (1946).

13. Because the *Larrison* test emerged out of the Seventh Circuit, that court's guidance respecting its application is especially valuable. Thus, it is worth noting that, over the years, courts in that circuit have employed different formulations of the second prong of the *Larrison* test. The original formulation permits the granting of a new trial if "the jury might have reached a different conclusion without [the perjured testimony]." *See supra*. That is to say, the original formulation instructs

courts to inquire whether the absence of the recanted testimony would have changed the outcome of the trial.

In contrast, under the second formulation of the second *Larrison* prong, courts may grant a new trial if "the jury might have reached a different conclusion[,]" which the Seventh Circuit has interpreted as assessing "whether a jury that knows that a material witness has lied would reach a different verdict." *United States v. Mazzanti*, 925 F.2d 1026, 1030 n. 6 (7th Cir.1991). Yet another formulation appears in *United States v. Reed*, 2 F.3d 1441, 1451 (7th Cir.1993), in which a new trial is permissible if "[t]he jury might have reached a different conclusion absent the false testimony *or* if it had known that

The Fourth Circuit adopted this formulation of *Larrison* in *United States v. Wallace*, 528 F.2d 863, 866 (4th Cir.1976). According to *Wallace*, "the district court, in order to grant a new trial, need find only that the jury 'might' have decided the case differently if [the recanting witness] had not testified, that is to say, that there is more than a faint possibility of a different jury verdict but something less than a probability." *United States v. Wallace*, 528 F.2d at 866 n. 3; *see also United States v. Carmichael*, 726 F.2d 158, 159–60 (4th Cir.1984); *United States v. Johnson*, 487 F.2d 1278, 1279 (4th Cir.1973); *United States v. Dworkin*, 116 F.R.D. 29, 30–31 (E.D.Va.1987).[14] The *Larrison* formulation, as adopted in *Wallace*, continues to be applicable today in this circuit. *United States v. Lofton*, 233 F.3d 313, 318 (4th Cir.2000). However, motions made on this basis, like the recantations underlying such motions are "looked upon with the utmost suspicion." *Johnson*, 487 F.2d at 1279 (citing *United States v. Lewis*, 338 F.2d 137, 139 (6th Cir.1964)).

## C. Which Test Applies In This Case?

Neither the *Mills* nor the *Larrison* test fits precisely the mixed fact pattern presented here. First, there is Archie, who has recanted his trial testimony and admitted that he lied at trial on a material issue. Although that admission was made to counsel for King and was not under oath, it is nonetheless a recantation.[15] Thus, if the motion were based only on Archie's recantation, the *Larrison* test would apply.

However, the testimony of Hughes, Motley and the Davis brothers about statements made by Lewis and Williams do not constitute recantation by a trial witness. Rather, the statements attributed to Lewis and Williams are analogous to, what one scholar, and some courts, have termed a "Recantation 'Once Removed.'" *See, e.g.*, 26 James Wm. *et al.*, Moore's Federal Practice, § 633.05[1] (3d ed.2002) (discussing situation "in which a third party swears that subsequent to the trial the witness admitted to the third party that the witness' testimony was false.").[16] *See also United States v. Colacurcio*, 499 F.2d 1401, 1406 (9th Cir.1974) (considering "re-

---

testimony by a material witness was false." (emphasis supplied).

The Fourth Circuit consistently has utilized the original formulation of the second prong when stating and applying the *Larrison* test.

**14.** Several circuits have abandoned the *Larrison* test altogether. *See generally United States v. Williams*, 233 F.3d 592, 593–95 (D.C.Cir.2000) (joining First, Second, Eighth, Ninth, and Tenth Circuits in rejecting *Larrison* test, in part, because that Court believes that there is "no good reason to treat newly discovered evidence of perjury differently than other types of newly discovered evidence[.]").

**15.** The United States does not argue otherwise. The United States does argue that Archie's recantation is not true because it is inconsistent with a pretrial statement he gave to state investigators. And, there is an apparent inconsistency, but Archie's recantation ex-

poses him to added time · in prison and the record contains nothing to show that he had anything to gain by admitting that he lied at trial. Nor does the record bespeak any familial or other closeness to either King or Crutchfield. Thus, his recantation is credible.

**16.** In the opinion of the authors of that treatise, "the third-party affidavit does not constitute material evidence [because], [w]ere the third party permitted to testify at a new trial, the third party's testimony would be merely impeaching." *Id.* Accordingly, those authors opine that motions based upon that type of "new evidence" are "inherently weak[ ]" and "virtually impossib[le]" to succeed upon. *Id.* However, no decision cited by the treatise in support of this view involved evidence of the force presented here. Nor do any of those cases involve an orchestration of perjury by a key prosecution witness, the effect of which is to call into serious doubt the validity of a verdict in a close case.

cantation once removed" fact-pattern). The Fourth Circuit has not expressly stated whether, under such circumstances, it is appropriate to apply the *Larrison* test for recanted testimony, or, instead, whether the general *Mills* standard applies.

On one hand, the facts underlying *Larrison*, and in most of the cases applying its three-part test, involved situations where material government witnesses themselves later recanted their trial testimony by attesting, usually in an affidavit, to the fact that, when they testified, they had been lying.[17] Here, in contrast, neither Lewis nor Williams has proffered an affidavit recanting their earlier testimony at the defendants' trial. And, at the hearing on the defendants' motions, both Lewis and Williams testified that they did not give false testimony or ask others to do so. (July 8 Tr. 161–62, 175–76).

Also, unlike *Larrison*, the record does not identify any post-trial statements by Lewis or Williams. Rather, *before* the trial, Lewis and Williams disclosed to Hughes, Motley, and the Davis brothers their intention to commit perjury in hopes of receiving a reduced sentence. And, Lewis solicited others to do the same.

On the other hand, the testimony of Hughes, Motley, and the Davis brothers clearly constitute evidence that two prosecution witnesses, Lewis and Williams, lied under oath at trial. Hughes, Motley and the Davis brothers also show that one of those witnesses solicited others to lie, outlined the subjects as to which they should lie, and coached several of the other witnesses about their testimony.

Furthermore, the Court believes the testimony of Hughes, Motley, and the Davis brothers, given at the motion for new trial hearings, that Lewis told them he was going to lie; that he told them the subjects to which his lies would be addressed; and that Lewis solicited them to do the same. And, the Court believes the testimony of Hughes and Motley that Williams let them know that he was going to lie at trial. In so doing, the Court finds that Lewis lied to the Court on July 8 when Lewis denied telling Hughes and Motley that he was going to lie and denied soliciting them to do likewise. And, in similar fashion, the Court finds that denials by Williams of his conversations with Hughes and Motley also were lies.[18] The testimony of Hughes, Motley, the Davis brothers and Archie tends to prove that Lewis and Williams gave false testimony at trial. And, that is confirmed by the fact that Lewis and Williams lied when, at the hearing on the motion for new trial, they denied the testi-

17. *See e.g., Wallace,* 528 F.2d at 865–66 (government witness proffered post-trial affidavit swearing that his original testimony had been false); *Carmichael,* 726 F.2d at 159–60 (government witness recanted trial testimony and signed affidavit with materially different version of facts); *Johnson,* 487 F.2d at 1278–79 (co-defendant government witness executed post-trial affidavit completely recanting his trial testimony insofar as it implicated movant); *Dworkin,* 116 F.R.D. at 30–31 (recantation by defendant-witness for obvious purpose of avoiding perjury charge).

18. Neither Hughes, Motley, nor the Davis brothers were shown to have any motive to lie about the topics to which they testified: their conversation with Lewis and Williams (as to Hughes and Motley). Furthermore, their testimony on those subjects is sufficiently consistent to be fully credible, the inconsistencies going to minor details and not being the result of falsehood. The testimony given about Archie's recantation is less reliable. And, were that the only evidence on the issue, the motions would not prevail. But, the testimony of Hughes, Motley and the Davis brothers tends to support important aspects of Archie's recantation. Finally, the Court viewed Lewis and Williams on July 8 and, the Court is satisfied that, on that day, they both lied under oath about whether, before trial, they had told Hughes, Motley and the Davis brothers what those witnesses swore that Lewis and Williams told them.

mony given by Hughes, Motley, the Davis brothers and Archie. That is highly probative of the assertion that they lied at trial. And, on this record, Archie admits having lied. Thus, the gist of the defendants' motion, and their proof, is that Lewis, Williams and Archie testified falsely at trial.

Accordingly, the most appropriate test to apply to this record is the *Larrison* test which focuses on how to determine the propriety of a new trial where the newly discovered evidence is of false trial testimony. *See e.g., United States v. Fruth*, 36 F.3d 649, 652 (7th Cir.1994) (comparing the "general test" with the *Larrison* test, which applies when the court is "faced with a claim that a witness testified falsely[.]"); *United States v. Griffin*, 84 F.3d 912, 930 (7th Cir.1996) (stating that "[t]he standard governing the adjudication of a Rule 33 motion based on perjured testimony mirrors the *Larrison* test[.]").

Furthermore, it is pertinent that the *Larrison* test is not, by its terms, limited to situations involving recantations; to the contrary, that test simply asks courts to consider whether it is reasonably likely that a witness committed perjury, and, if so, the impact of that perjury on the jury's deliberations. That recognition weighs in favor of applying the *Larrison* test to the facts of this case.

## II. Application Of The *Larrison* Test

■ For the reasons set forth above, the Court is reasonably well satisfied that Lewis gave false testimony at trial about very important aspects of the conspiracy case against Crutchfield and King and about the misprision of a felony charge against King. The Court also is reasonably well satisfied that Williams gave false tes-

timony about the conspiracy case against Crutchfield and King. And, notwithstanding the inconsistencies respecting Archie's recantation testimony, the Court is reasonably well satisfied that important aspects of his trial testimony were false as well.

As explained earlier, all three witnesses were material. But, as also explained previously, Lewis was the centerpiece of the prosecution's case on the conspiracy charge as to both defendants and the misprision of a felony charge against King. Indeed, allowing Lewis to escape detection is the essence of that charge, and, Lewis was the only meaningful witness to the conduct at issue in that charge.

The importance of Lewis, Williams and Archie must be viewed through the prism of the prosecution's case as a whole.[19] As explained, much of the substance of the prosecution's case was put on through the testimony of drug addicts who were heavy users of potent memory affecting drugs and whose drug use obviously had affected their memories. Other key aspects of the prosecution's case on the conspiracy charge came from drug dealers standing to benefit from prospective sentence reduction motions.

By its verdict, the jury rejected the testimony of the prosecution's key witnesses on many of the acts alleged to comprise proof of the conspiracy. It even rejected Williams's testimony on Count Three, a specific act of crack distribution.

The jury could not have convicted King on the misprision charge, Count Two, without accepting Lewis's testimony. And, Lewis's testimony, supported as it was by Williams and Archie, was the linchpin of the prosecution's case against both defendants on Count One. Thus, the testimony as to which Lewis and Williams likely lied,

---

**19.** In making the assessment, the district judge is to draw "upon the knowledge and observations gained by presiding at the original trial in evaluating the evidence presented at the hearing [on the motion for new trial]." *United States v. Johnson*, 487 F.2d 1278, 1279 (4th Cir.1973).

like that as to which Archie has admitted lying, was material.

As to the second element under *Larrison*, it is, in the judgment of one who presided at the trial, quite likely that the jury might have reached a different conclusion without the false evidence. Lewis, an admitted major drug dealer, was King's nephew, and it was made to appear at trial that Lewis was a very reluctant accuser of his uncle. That helped the United States overcome the doubt that was created by the testimony of the drug addicts and of the many other drug dealer witnesses, who like Lewis, were hoping for sentence reductions.

That, indeed, was a principal theme of the prosecution's closing argument. For example, the prosecutor said:

Well, let's talk about what Maurice Lewis has to gain. Maurice Lewis came in this courtroom, he says, yeah, I know if I tell a lie, I'm not going to get any credit for anything that I've done, but I'm going to tell you the truth. But even as Maurice Lewis testified that the blood that runs in his veins said this is family, he tried his best not to tell but so much about his uncle.

(Nov. 17 Tr. 4–5). Later, to make the point that Lewis showed King to be a drug dealer, the prosecutor stated:

And they all knew that Marshall was a state trooper. They had no fear of Marshall. They had no fear of him at all. The reason they didn't have any fear is because it was Maurice's uncle who was a drug dealer, and all of these guys were Maurice's constituents. That's what it was all about.

And Maurice said, yeah, I give him money on occasions. He minimized it. Of course he would because that's, again, that's his uncle. As difficult as it was, he put it out there. He put it out there enough to get beyond that question of

reasonable doubt that you will hear a whole lot about before this case is over. (Nov. 17 Tr. 14). As the record shows, Lewis was anything but reluctant.

Williams ostensibly had little to gain by his testimony and the same was true for Archie. And, their admittedly untruthful testimony corroborated that given by Lewis, as was the plan. They too, therefore, were significantly instrumental in the prosecution's case on Count One.

Without the testimony of Lewis, Williams and Archie, the prosecution's case depended on the testimony Carnell Meredith, Maurice Harvey, Willie Hicks, Carnell Johnson and several women whose drug use rendered them so incredible that it caused the jury to acquit on the charges to which they were central. Although Meredith and Harvey put King at Lewis's grandmother's house when drug dealing was underway, they both placed King at locations from which he could not see the drug deals. Neither witness implicated Crutchfield in the alleged conspiracy at all.

While Hicks testified that King witnessed drug transactions, he did not implicate Crutchfield. However, Hicks, who testified under a grant of immunity, was largely neutralized on cross-examination. Although Johnson implicated King and Crutchfield in the alleged conspiracy, a goodly segment of his testimony described lawful activity that often is engaged in by law enforcement officers: use of one drug dealer or drug user to catch others further up the chain of distribution. And, like Hicks, Johnson was effectively neutralized on cross-examination.

Having observed these witnesses at trial and having observed the entire trial, the Court has no hesitation in deciding that without the testimony of Lewis, Williams and Archie, the jury might well have reached a different result on both Count One and Count Two.[20]

---

20. That assessment takes into account the im-      peaching evidence offered at trial as to King's

In sum, the defendants have satisfied the first and second facets of the *Larrison* test. There is no dispute that the defendants did not know of the falsity of the testimony until after trial. So the third element of *Larrison* is met. Therefore, under *Larrison*, the defendants are entitled to a new trial.

## III. Application Of The *Mills* Test

The first, second and fourth elements of the *Mills* test are not at issue. The first ground of dispute under *Mills* is addressed to its third element: whether the evidence is merely cumulative or impeaching; and, if so, whether this record nonetheless presents an exceptional case that would justify granting a new trial.

To begin, it is appropriate to note that Archie's recantation is beyond this analysis. He admitted lying at trial and that is not merely cumulative nor is it mere impeachment within the meaning of *Mills*.

Cumulative evidence is that which addresses trial testimony on the same subject. *Berry*, 10 Ga. at 527. The evidence of Hughes, Motley and the Davis brothers, that Lewis had stated to each of them that he intended to lie and that he solicited Williams, Hughes, Motley and the Davis brothers to do likewise, is certainly not cumulative. Nor is the testimony of Hughes and Motley that Williams said that he, at Lewis's instance, was going to lie. Nor is the evidence that Lewis coached Williams, Carnell Meredith, Santos and Hicks cumulative.

Impeaching evidence, within the meaning of *Mills*, is evidence that undermines the character or credibility of the witness. In one sense, the testimony of Hughes, Motley and the Davis brothers is certainly a potent arsenal for impeachment, and it is

undeniably valuable to that end. But, the testimony of these witnesses is far more significant than its impeachment value. It strikes at the heart of the prosecution's case because, if believed, it eviscerates the testimony of the prosecution's key witness, Lewis, on both counts of conviction and it calls into serious doubt the testimony of the prosecution witnesses who were coached by Lewis, viz., Williams, Santos, Hicks and Meredith.

The evidence of Motley and Hughes effectively forecloses the prosecution's ability to rely at a new trial on Williams as probative of the conspiracy charge and, considering that the jury did not convict on a crack distribution charge for which Williams was the key witness, the jury could not rely on him at all, if it were informed of what Hughes and Motley have to say. Nor would Lewis any longer be a viable witness. It is beyond question that Archie's recantation, if known, would preclude any jury from believing him. In sum, the newly discovered evidence likely would have the effect of foreclosing the prosecution from even offering the testimony of Lewis, Williams and Archie. Without their testimony, the testimony of the other witnesses, Meredith, Harvey, Johnson, Hicks and the seven drug-addicted women, would be unlikely to result in conviction at a new trial.[21]

If, however, the prosecution offered Lewis, Williams and Archie at a new trial, they would be shown to be so substantively unworthy of belief that the defense would achieve a major advantage before the jury on the merits of the case, an advantage that probably would produce an acquittal. That is especially so considering the weakness of the prosecution's other evidence

---

testimony at trial. It does not consider what King tried to do after the July 8 hearing for that should not be considered in applying the *Larrison* test.

21. The six law enforcement witnesses, because of the limited substance of their knowledge, would not likely tip the balance in favor of conviction on Count One or Count Two.

and the impact of the newly discovered evidence on the credibility of the prosecution's other witnesses who were coached by Lewis.

Thus, by any definition, the newly discovered evidence is not "mere impeachment" under *Mills*. Rather, it is of substantive, outcome determinative, significance.

But, if, somehow, the newly discovered evidence is characterized only as impeachment, it fits the circumstance described by the Fourth Circuit in *McCoy:* "[n]ewly discovered [impeaching] evidence, however, may go so directly to the interest of the prosecution's witness that, if his testimony was essential to the prosecution, a new trial should be awarded in which the interest of the witness may be shown." *McCoy*, 478 F.2d at 847. In other words, this case is of such an exceptional nature that the interest of justice calls for a new trial. Here, Lewis, the prosecution's key witness, had such an interest adverse to King that he not only lied but he also successfully recruited others to lie and coached them in how to lie. Those facts make *McCoy* applicable.

The fifth *Mills* element is whether the testimony of Hughes, Motley, the Davis brothers and Archie would probably produce an acquittal on a new trial. As explained above, it would probably have that result.

The prosecution's case, although presented through several witnesses, was, in fact, not a strong one. In fact, the jury acquitted the defendants on all but two of the charges it considered. That was be-

cause the prosecution's case was presented through many witnesses whose credibility was shown to have been non-existent or unreliable. But, Lewis, although impeachable as a cooperator in search of a sentence reduction, was bolstered because he was a major drug dealer reluctantly testifying against his own flesh and blood. And, Williams and Archie were ostensibly credible in corroborating Lewis.

Considering all of the prosecution's witnesses, it is accurate to say that, without Lewis, Williams and Archie, it is highly unlikely that a jury would find King guilty of Count Two or King and Crutchfield guilty of Count One. An acquittal probably would be the result of trial of the same configuration absent Lewis, Williams and Archie.[22] And, even if they testified at a new trial, the evidence available through Hughes, Motley, the Davis brothers and Archie would likely produce the same result.

■ The United States argues that the fifth element must be decided in perspective of evidence that the prosecution had at the ready, but did not use, at the trial. To show that there is strong evidence available to present at a new trial, the United States offered the affidavit of George Austin, Jr., the lead investigator for the Virginia State Police.[23] The affidavit explained in considerable detail, the evidence that was available at trial but was not used. The affidavit also recounted statements that had been made by possible witnesses during the investigation. All told, says the United States, that evidence would corroborate Lewis, Williams and Archie, or, al-

---

**22.** This assessment also considers the evidence that impeaches King's testimony. In the unlikely event that King were to testify at a new trial, he would be impeachable and that would make the case a closer one. However, it is improbable that King would testify at a new trial.

**23.** On September 23, the United States offered to have Austin testify to the same effect as his affidavit, proffering that, if Austin were permitted to testify, he would confirm that which is on his affidavit. The Court held that it could not consider such evidence in deciding the motion.

652

ternatively, it would be sufficient to prove a case without them.

The United States cited no authority that a court should assess the probability of acquittal at a new trial by assessing evidence that the prosecution had available at the first trial, but did not present.[24] That approach raises serious issues respecting the defendants' rights under the Sixth and Seventh Amendments. Wholly apart from those concerns, it is not really possible to do what the United States suggests. It is difficult enough to assess the probability of acquittal when the witnesses have testified under the rules of evidence, when they have faced cross-examination, when the Court has the benefit of the jury's verdict, and when the Court has heard the evidence and the witnesses, both at trial and in support of the motion. Where the prosecution asks the Court to consider the effect of evidence that would have been offered, evidence that has not been tested by cross-examination or circumscribed by the rules of evidence, the exercise becomes one of sheer speculation. The Court declines to speculate on the basis of hearsay, double hearsay, and a modicum of uncross-examined firsthand knowledge and, thereupon, to surmise how a case of that configuration would come out without the testimony of Lewis and Williams and Archie or with that testimony but also with the testimony of Hughes, Motley and the Davis brothers and the recantation of Archie.

Lastly, the prosecution has suggested that the Court's decision on July 8, granting the new trial, was in error because the Court did not decide that Lewis and Williams, in fact, had lied at trial. Neither *Larrison* nor *Mills* necessitate such a finding. But, if that view is wrong, and lest there be any doubt, after hearing Hughes,

Motley and the Davis brothers testify, after having heard the evidence of Archie's recantation, after having heard Lewis and Williams testify at the July 8 hearing and at trial, and after having reviewed the trial transcript of Lewis and Williams, the Court would decide that Lewis and Williams and Archie lied at trial on material matters that permitted the jury to convict on Counts One and Two. The Court also would decide that Lewis and Williams did precisely what they told Hughes, Motley, and the Davis brothers that they were going to do. Archie has admitted lying.

Thus, if *Mills* supplies the standard for determining the propriety of a new trial in this case, the defendants have met its requirements.

## CONCLUSION

All of the factors under *Mills* and *Larrison* must be examined in perspective of the broader interests of the public in [t]he untainted administration of justice[,] which the Supreme Court of the United States has referred to as "one of the most cherished aspects of our institutions." *Mesarosh*, 352 U.S. at 8, 77 S.Ct. 1 (stating that "[t]he government of [a] strong and free nation does not need convictions based upon [perjured] testimony. It cannot afford to abide with them."). This final consideration always looms large whenever a court is confronted with evidence that a witness has committed a fraud upon it and upon the jury that heard the case.

Rule 33 is animated by the interest of justice. That interest has two components: justice for the defendant and justice for society. No defendant should be convicted on the basis of lies. Society cannot suffer a jury verdict to stand where a district court, having presided at the trial, after applying the controlling legal

24. The Court has considered all evidence offered in the original trial because both *Larrison* and *Mills* require that to be done. But that is far different than considering potentially available but unoffered testimony.

principles, concludes that confidence cannot be reposed in that verdict. The lies that Archie told, the lies that Lewis told, the lies that Lewis orchestrated with Williams, and the coaching given other witnesses by Lewis, all make it impossible to repose any confidence in the verdict of guilty on Count One and Count Two.

If the defendants are guilty and if, as it says, the United States has in reserve evidence not borne of untruth, the defendants will be convicted by a jury uninfluenced by the testimony of prosecution witnesses who have lied, who have solicited others to lie, who have been solicited to lie, and who have been coached in their lies by an essential prosecution witness. If the United States decides to call those witnesses, the jury will know of the lying and the coaching before it renders its verdict.

For the foregoing reasons and because the defendants have satisfied both the *Larrison* and *Mills* tests, the Motion for Reconsideration is denied and the Motions for New Trial are granted.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.

### ORDER

For the reasons set forth on the record on July 8 and September 24, 2002, respectively, as explicated further in the accompanying Memorandum Opinion, it is hereby ORDERED that the Motion for Reconsideration filed by the United States is denied and the defendants' Motions for New Trial are granted.

The Clerk is directed to send a copy of this Order to all counsel of record.

It is so ORDERED.